PAUL CASHEN AND IRENE CASHEN, HIS WIFE, PLAIN-
TIFFS-RESPONDENTS AND CROSS-APPELLANTS, v.
FRANK SPANN, ROBERT BICKLEY, JOHN DUNNE, DE-
FENDANTS-APPELLANTS AND CROSS-RESPONDENTS,
AND CHARLES M. EGAN, JR., ANTHONY DE BIASI,
COUNTY OF MORRIS, AND NEW JERSEY BELL TELE-
PHONE COMPANY, DEFENDANTS-RESPONDENTS, AND
THE STATE OF NEW JERSEY, INTERVENOR-APPEL-
LANT.

Argued October 22, 1974—Decided February 25, 1975.

542

*Mr. Stephen S. Weinstein* argued the cause for defendants-appellants and cross-respondents, Frank Spann, Robert Bickley and John Dunne (*Mr. Herbert M. Korn,* on the brief).

*Mr. Joseph S. Accardi* argued the cause for plaintiffs-respondents and cross-appellants, Paul Cashen and Irene Cashen (*Messrs. Accardi & Koch,* attorneys; *Mr. Accardi,* on the brief).

*Mr. Richard W. Berg,* Deputy Attorney General of New Jersey, argued the cause for intervenor-appellant, The State of New Jersey (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Berg,* of counsel and on the brief).

*Mr. William T. McElroy* argued the cause for defendants-respondents, Charles M. Egan, Jr., Anthony De Biasi, and County of Morris (*Messrs. McElroy, Connell, Foley &*

*Geiser,* attorneys; (*Mr. McElroy,* of counsel; *Mr. Edward B. Deutsch,* on the brief).

*Mr. Charles A. Sweeney* argued the cause for defendant-respondent, New Jersey Bell Telephone Company.

The opinion of the Court was delivered by

PASHMAN, J. This is a civil action for damages arising out of an allegedly illegal search of plaintiffs' home. On June 19, 1970 detectives of the Morris County Prosecutor's Office and police officers from the Borough of Wharton executed a search warrant at plaintiffs' residence seeking evidence of gambling activity. The detectives allegedly relied upon information provided by a "reliable informer" in preparing the affidavit in support of the search warrant. The facts are set out in some detail below and need not be recited at length here. It suffices to note that it is now conceded that the affidavit was grossly erroneous in significant respects and that the search failed to reveal any evidence of gambling activity.

To recover for damages resulting from the preparation of the erroneous affidavit and the execution of the search warrant, plaintiffs instituted the present suit against the Prosecutor of Morris County, four detectives, New Jersey Bell Telephone Company, the County of Morris, the Borough of Wharton, and "John Doe," the "reliable informer," whose identity is unknown.

The trial court granted motions for summary judgment in favor of all defendants and denied plaintiffs' motion to compel answers to interrogatories which would have required the disclosure of the identity of the informer. In a well-reasoned and in-depth opinion by Judge Lynch, the Appellate Division affirmed the summary judgment for all of the defendants except three of the detectives, Bickley, Spann, and Dunne, and reversed the denial of plaintiffs' motion to compel discovery as to the identity of the informer. *Cashen v. Spann,* 125 *N. J. Super.* 386 (App. Div. 1973).

We granted petitions for certification by the detectives, and the State,[1] and the cross-petition submitted by plaintiffs. 65 N. J. 290 (1974).

With certain modifications discussed below, the judgment is affirmed substantially for the reasons expressed by the Appellate Division.

## I

Relying on *Hann v. Lloyd*, 50 *N. J. L.* 1 (Sup. Ct. 1887), the Appellate Division's analysis of the immunity of the defendant prosecutor proceeded on the theory that the "prosecutor was cloaked with the same immunity as possessed by a judge." *Cashen, supra* 125 *N. J. Super.* at 395. We do not believe that this approach is supported by the law of this State, but in any event, we feel that there are compelling reasons for distinguishing the two forms of official immunity.

The unqualified immunity of judges is well established in New Jersey. As early as 1818, in *Little v. Moore*, 4 *N. J. L.* 82 (Sup. Ct. 1818), the court observed that it is a "universal position, which admits of no exception" that judges are immune from suit for mere errors of judgment in the discharge of their official duties. 4 *N. J. L.* at 83. Commenting on the need for recognizing this immunity, the court said:

It is a principle which lies at the very foundation of a free, vigorous and independent administration of justice. It may be traced from the earliest periods of our judicial history down to the present day. \* \* \* Indeed, were we to subject the judges of the established courts of justice to private prosecutions whenever the passions or resentments of disappointed suitors might dictate that measure,

---

[1] On February 26, 1974 the Court granted the motion of the Attorney General on behalf of the State for leave to intervene.

we should subdue their independence and destroy their authority. [4 *N. J. L.* at 84]2

The principle which recognizes that judges must be free from the threat of civil suit in order to discharge their judicial functions with the independence required by the public interest has been consistently adhered to by the courts of this State in the years since *Little, supra; Mangold v. Thorpe,* 33 *N. J. L.* 134, 136–37 (Sup. Ct. 1868); *Loftus v. Fraz,* 43 *N. J. L.* 667, 669 (E. & A. 1881); *Grove v. Van Duyn,* 44 *N. J. L.* 654, 656–57 (E. & A. 1882). More recently, in *O'Regan v. Schermerhorn,* 25 *N. J. Misc.* 1, 50 *A.* 2d 10 (Sup. Ct. 1946), a suit by a former prosecutor and his assistants against the members of a grand jury alleging libel, the court observed that the grand jury operates as an arm of the court. 25 *N. J. Misc.* at 19. With reference to judicial officers, the court said:

It is settled by the great weight of authority, on considerations of public policy, that all officers exercising judicial functions are absolutely privileged in what they speak, write or do in the performance of their judicial acts, at least where such statements are relevant and pertinent to the matter before them. Such acts are judicial acts and cannot form the basis for money damages, if the officer had jurisdic-

---

2*See also, Taylor v. Doremus,* 16 *N. J. L.* 473 (Sup. Ct. 1838), in which Hornblower, C. J., declared:

That an action will not lie against a judge for *an error in judgment,* however prejudicial to the rights of the party such error may be, is a proposition so plain, so consonant to reason, and so essential to the very existence of courts of justice, that it needs neither authority nor argument to support it.

But suppose the judgment to have been given *mala fides,* and under the influence of bribery and corruption, may not the injured party be permitted to aver such abuse of power, and to recover damages, if he can prove his averment! I answer no. Every argument that forbids an action for a mistake in judgment, applies with equal, nay, with increased force against such a proposition. No man would accept the office of a judge, if every disappointed and ill tempered litigant, might compel him to join issue, and submit himself to trial upon the question of his integrity. [16 *N. J. L.* at 475–76 (emphasis in original)].

tion of the parties and jurisdiction or color of jurisdiction of the subject-matter, even though in exercising such jurisdiction he acts erroneously, illegally, irregularly or in excess of jurisdiction, and such acts are alleged to have been done maliciously and corruptly. [25 *N. J. Misc.* at 20].

The United States Supreme Court has also had occasion to consider the concept of judicial immunity, and in the early case of *Bradley v. Fisher,* 80 *U. S.* (13 Wall) 335, 20 L. Ed. 646 (1872), the Court declared that it is a principle of "the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself." 80 *U. S.* (13 Wall) at 347. The Court also emphasized that the immunity afforded to judges was firmly established not only in the common law, but in other systems of jurisprudence as well:

The principle, therefore, which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any well-ordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country.

It has, as Chancellor Kent observes, "a deep root in the common law." [80 *U. S.* (13 Wall) at 347 (citation omitted)].

More recently, in *Pierson v. Ray,* 386 *U. S.* 547, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967), the Court reiterated the historic nature of the privilege by observing that "[f]ew doctrines were more solidly established at common law." 386 *U. S.* at 553–54, 87 S. Ct. at 1217. The Court, however, emphasized that the privilege is recognized not to protect the corrupt judge, but rather for the benefit of the public in whose interest it is that judges must be free to exercise the functions of their office without fear of the consequences. 386 *U. S.* at 554, 87 S. Ct. 1213. *See also McCray v. Maryland,* 456 *F.* 2d 1 (4 Cir. 1972).

■ Although it is clear that the public has a comparable interest in the independence of the prosecutorial function which warrants the extension to them of a limited form of immunity, we decline to characterize prosecutorial immunity as absolute or to equate it with its judicial counterpart. In so doing we are mindful that the courts of other jurisdictions have often compared the official immunity of prosecutors to that enjoyed by judges. *See, e. g., Yaselli v. Goff*, 12 *F*. 2d 396, 404 (2 Cir. 1926), aff'd *per curiam*, 275 *U. S.* 503, 48 S. Ct. 155, 72 L. Ed. 395 (1927); *Bethea v. Reid*, 445 *F*. 2d 1163, 1166 (3 Cir. 1971), *cert.* den. 404 *U. S.* 1061, 92 S. Ct. 747, 30 L. Ed. 2d 749 (1972); *Bauers v. Heisel*, 361 *F*. 2d 581, 589 (3 Cir. 1966), *cert.* den. 386 *U. S.* 1021, 87 S. Ct. 1367, 18 L. Ed. 2d 457 (1967); *Gabbard v. Rose*, 359 *F*. 2d 182, 185 (6 Cir. 1966); *Kenney v. Fox*, 232 *F*. 2d 288, 290 (6 Cir. 1956), *cert.* den. 352 *U. S.* 856, 77 S. Ct. 84, 1 L. Ed. 2d 66 (1956); *Lundblade v. Doyle*, 376 *F*. *Supp.* 57, 60 (N. D. Ill. 1974). In our view, however, there are persuasive reasons for not equating the two forms of immunity.

We are also satisfied that the case law of this State is consistent with our conclusion that the two forms of immunity are not identical. Although the issue of prosecutorial immunity had occasionally been before the lower courts,[3] in

---

[3]In *Hann v. Lloyd*, 50 *N. J. L.* 1 (Sup. Ct. 1887), the plaintiff alleged assault, battery and false imprisonment on the part of a sheriff, a constable and a prosecutor of the pleas as a result of the execution of a writ of "compulsory process" to procure plaintiff's presence as a witness in a pending criminal trial. In concluding that a jury instruction to find in favor of defendants was proper, the court said:

Mr. Addison in his work on Torts, section 922, thus states the doctrine of the law on this head: "Generally speaking, however, so long as the process has not been set aside it is a protection to the attorney who has issued it, and to the client by whose commands it has issued. And though when it has been set aside it is no longer a justification to them, yet it always remains a justification to the sheriff and his officers, who had no option but to obey it." Under the circumstances stated, the prosecutor of the pleas, with respect to what he did, was invested with an immunity similar to that

*State v. Winne,* 12 *N. J.* 152 (1953), a criminal prosecution for nonfeasance in office, Chief Justice Vanderbilt indicated that the Supreme Court had not yet considered the problem:

> It is to be noted that in some jurisdictions a county prosecutor is not subject to a civil suit for damages at the hands of an aggrieved citizen, though that point has not been passed on here. [12 *N. J.* at 170 (citations omitted)].

Later that same year, this Court decided *Earl v. Winne,* 14 *N. J.* 119 (1953), an action against the Bergen County Prosecutor and two of his detectives. The complaint alleged false arrest and imprisonment, malicious prosecution, malicious abuse of process, and conspiracy arising out of plaintiff's arrest and indictment for criminal libel. The prosecutor defended on the grounds of, among other things, the lack of civil liability on the part of defendants as public officers. 14 *N. J.* at 123–124. In concluding that the prosecutor and his assistants do not enjoy unqualified immunity from civil suit, the Court said:

> The prosecutor of the pleas and his assistants are charged with the obligation to act in due accordance with the law in the discharge of their public duties, particularly by initiating such a proceeding by filing a complaint in a proper manner as established by the prevailing practice. The mere fact that their private rights have been invaded

which was possessed by the constable and the sheriff. [50 *N. J. L.* at 5].

*See also Edelman v. Dunn,* 107 *N. J. L.* 353 (E. & A. 1931) in which the court held that an action for unlawful detention and imprisonment could not be maintained even in the face of allegations that the assistant prosecutor acted maliciously in refusing to accept bail. The court did not base its conclusion on prosecutorial immunity but rather on the fact that a statute precluded prosecutors from exercising control over bail:

We therefore conclude that the refusal by a public official to perform an official act for which there is no statutory authority, does not constitute a cause of action, even though his grounds for refusal were improper and he was actuated by a malicious motive, as the legality of an act cannot be changed or affected by the motive with which it is done. [107 *N. J. L.* at 354].

permits no deviation based upon personal predilection or gain. They have the benefit of the presumption that they act legally in the discharge of their public duty, but if the presumption is overcome by convincing proof that they acted in excess of and distinct from their required official duty for personal reasons of their own, then for such acts they are civilly liable. It is only such acts which are redressable in actions for malicious prosecution and malicious abuse of process. [14 *N. J.* at 134].

More recently, in *DeGroot v. Muccio,* 115 *N. J. Super.* 15 (Law Div. 1971), an action alleging wrongful participation in the murder prosecution of plaintiff on the part of, among others, the Passaic County Prosecutor, his assistants and a confidential aide, the trial court refused to dismiss all of the allegations against defendants based on the gravity of the charges. The gist of the complaint accused defendants of knowingly using perjured testimony on the part of two witnesses to implicate plaintiff and to "cover up" mistakes in their investigation. 115 *N. J. Super.* at 18.

Defendants moved for a dismissal of the complaint based on "the rule of judicial immunity and its application covering conduct in the realm of the public prosecution." 115 *N. J. Super.* at 20. After acknowledging that no case from this Court had explored the problem of extending a judicial-type immunity to defendants, the trial court reviewed the authorities from other jurisdictions and found that "the persistence and durability of the defense is remarkable." 115 *N. J. Super.* at 23. The court, however, found the charges of subornation of perjury in the case before it to be not only " 'serious,' " but *"horrendous."* 115 *N. J. Super.* at 29 [emphasis in original]. In the court's view the enormity of the allegations made it unnecessary to hold that a prosecutor in New Jersey has a defense to civil suits, or to define the limits of prosecutorial immunity:

[C]itation of authority is unnecessary for the proposition that conduct such as is alleged in transaction (1) is actionable in tort. No rationalization could possibly shield evil acts of such magnitude. [115 *N. J. Super.* at 29–30].

Thus it is clear that New Jersey case law to date has not equated prosecutorial immunity with its judicial counterpart and reflects the philosophy that there are indeed circumstances in which a prosecutor will incur civil liability for his official conduct. We wish to make it clear that we believe that this is the preferable approach to future problems involving the civil immunity of prosecutors in this State. The public interest is best served by recognizing that prosecutors enjoy only a limited form of immunity.[4]

---

[4]Although this case involves a cause of action which accrued prior to July 1, 1972, it should be noted that the New Jersey Tort Claims Act, *N. J. S. A.* 59:1-1 *et seq.* (Supp. 1974-75) also establishes limits on the immunity which it extends to public employees for injuries caused by the institution or prosecution of judicial or administrative proceedings. *N. J. S. A.* 59:3-8 (Supp. 1974-75) provides that:

> A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment.

The 1972 comment to the above provision makes it clear, however, that there are limits to the immunity granted by the section:

> This provision recognizes an immunity generally followed at common law. See DeGroot v. Muccio, 115 N. J. Super. 15, 277 A. 2d 899 (Law Div. 1971) ; Grove v. Van Duyn, 44 N. J. L. 654, 43 A. R. 412 (E. & A. 1882) ; Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc., 31 N. J. 124, 155 A. 2d 536 (1959). It should be noted that the immunity does not extend to conduct amounting to a crime or constituting actual malice, actual fraud or willful misconduct.

Other sections also emphasize that the immunity granted by the act is not boundless. Section 59:3-14 provides:

> 59:3-14. *Public employee Immunity — exception*
>
> a. Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.
>
> b. Nothing in this act shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.

■ For purposes of this case we need not consider the outer limits of prosecutorial immunity since we wholly agree with the conclusions of the Appellate Division that plaintiffs' allegations do not support any inference that the prosecutor in this case acted out of personal motive, with malicious intent, or in excess of his jurisdiction.

## II

■ We also agree with the Appellate Division that in the context of this case, the prosecutor and the detectives are to be considered as agents of the State and not the county. *Cashen, supra,* 125 *N. J. Super.* at 404–05. We wish to make it clear, however, that our resolution of this issue is limited to the factual circumstances here presented. We find it appropriate to regard the defendant officials as State agents where the alleged tortious conduct arose out of the investigation of criminal activity, but we express no opinion on the question of whether the prosecutor or his detectives can be considered State or county employees for other purposes. *See Cooper v. Imbriani,* 63 *N. J.* 535 (1973). We also leave for another day the question of whether a county may be held vicariously liable for the conduct of a prosecutor or his detectives in other circumstances.

## III

Our primary area of disagreement with the Appellate Division, however, concerns the disclosure of the identity of the "John Doe" informer. The Appellate Division concluded that no valid public purpose was served by withholding the identity of the informer upon which the affidavit was based. *Cashen, supra,* 125 *N. J. Super.* at 408.

The Appellate Division recognized that what is often termed the "informer's privilege" is in reality a privilege afforded the government in recognition of the compelling need of the State to protect its sources of information concerning criminal activity. The United States Supreme Court

in *Roviaro v. United States*, 353 *U. S.* 53, 77 S. Ct. 623, 1 L. Ed. 2d 639 (1957), observed that the privilege reflects the interest of society in effective law enforcement:

The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation. [353 *U. S.* at 59, 77 S. Ct. at 627].

■ The privilege, however, is not unlimited, and in exploring its boundaries in *Roviaro, supra*, the Court observed that the scope of the privilege must be limited by the purposes it serves. One of the limits identified by the Court is founded upon the "fundamental requirements of fairness." 353 *U. S.* at 60, 77 S. Ct. 623. The Court, however, declined to establish a fixed rule governing disclosure, recognizing that the problem required a balancing of the competing interests involved on a case by case basis:

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. [353 *U. S.* at 62, 77 S. Ct. at 628]

We adopted the *Roviaro* approach in *State v. Burnett*, 42 N. J. 377 (1964), and our rules of evidence reflect the limitations of fairness upon the privilege.[5] While we are sen-

---

[5] *Evid. R.* 36, *N. J. S. A.* 2A:84A–28 provides:

A witness has a privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of a provision of the laws of this State or of the United States to a representative of the State or the United States or a governmental division thereof, charged with the duty of enforcing that provision, and evidence thereof is inadmissible, unless the judge finds that (a) the identity of the person furnishing the information has

sitive to the fairness limitation on the scope of the privilege, it is important to emphasize that unwarranted disclosure of government informers poses a very real threat to the continued vitality of the principle. We recognized this danger in *State v. Oliver,* 50 *N. J.* 39 (1967):

> In dealing with the informer privilege, we must be mindful of the ease with which the privilege would be destroyed if disclosure were required without a substantial showing of a need for it. [50 *N. J.* at 47].

■ Although the question is one of first impression in this State, it is now clear that the balancing process set forth in *Roviaro* is applicable to civil as well as criminal cases. *Westinghouse Electric Corp. v. Burlington,* 122 U. S. App. D. C. 65, 351 *F.* 2d 762 (D. C. Cir. 1965):

> Appellee argues that the *Roviaro* standard would never justify disclosure in civil cases in which the Government is not a party. But the fact that the case is civil rather than criminal is not dispositive. * * * The policies behind the privilege and its exceptions extend to civil as well as criminal cases. Presumably most informers do not want their names to be revealed in either a civil or criminal proceeding. The fact that there would be a somewhat greater chance, statistically, of having their identity revealed if disclosure is required in civil cases would be unlikely to deter citizens from informing. There is no logical reason to set up two different privileges, one for civil and one for criminal cases. The defendant in a criminal case may have a greater stake than a party in a civil case, but that would not always be so: even admitting the probability of a greater risk of retaliation in a criminal case. The *Roviaro* balance should be struck in each case, civil and criminal, in deciding whether disclosure "is essential to a fair determination of a cause." [351 *F.* 2d at 769 (quoting *Roviaro, supra*)].

*See also Mitchell v. Roma,* 265 *F.* 2d 633 (3 Cir. 1959). *See generally* Annotation, "Application in Federal Civil Action, of Governmental Privilege of Nondisclosure of Identity of Informer," 8 *A. L. R.* Fed. 6 (1971) and cases cited therein.

already been otherwise disclosed or (b) disclosure of his identity is essential to assure a fair determination of the issues.

In the present case, the Appellate Division struck the balance in favor of disclosure because in its view the information supplied by the informer was false; thus he could not be considered reliable. As a result, the court found that "[n]o public benefit would be served by continuing his 'informer' services." *Cashen, supra,* 125 *N. J. Super.* at 408–409.

While we are satisfied that the Appellate Division correctly identified the balancing test to be applied in cases such as this one, we doubt that either the trial court or the Appellate Division had before it an adequate record to actually perform the delicate and difficult balancing of interests called for. Hence we vacate the order of the Appellate Division directing disclosure of the identity of the informant.

 ██ If, on remand, plaintiffs choose to press their motion to compel discovery and either the State or defendants,[6] by a suitable motion for a protective order pursuant to *R.* 4:10–3, resist discovery, the trial court will be required to consider all the facts bearing both on the possible unfairness to plaintiffs of denying disclosure of the identity of the informer and the possible harm which may be inflicted on State interests by disclosure. In evaluating the former, the court should consider, *inter alia,* the nature of the claims asserted by plaintiffs, the actual loss alleged, plaintiffs' reasons for seeking disclosure, and the likelihood that the evidence about or testimony by the informant will be necessary to plaintiffs' case. In evaluating the latter, the court should consider the risk of possible prejudice to pending or

---

[6] *Evid. R.* 36 gives the "witness," in this case defendants, the right to assert the privilege. Since, however, the privilege exists for the benefit of the State, the State may also assert the privilege on its own behalf. When the State has not been joined as a party defendant, it is appropriate to permit it to intervene for the limited purpose of seeking a protective order against disclosure of the identity of an informer. *Cf. O'Keefe v. Boeing Co.,* 38 *F. R. D.* 329 (S. D. N. Y. 1965).

future prosecutions as well as the danger that the informant may be exposed to physical harm, harassment, or other untoward consequences. It is proper for the court to give less weight to the interests of plaintiff if it appears that he has suffered only insubstantial damages. The risk of loss to plaintiffs resulting from the nondisclosure of the informant may be pure conjecture. *See Black v. Sheraton Corp. of America*, 47 *F. R. D.* 263 (D. D. C. 1969). We wish to emphasize that in civil cases in which disclosure is sought not to aid in the defense of criminal charges, but for the purpose of asserting claims for money damages, the interests of the State in maintaining the confidentiality of the informer's identity are entitled to a greater degree of respect.

The reliability of the informant or lack thereof, upon which the Appellate Division placed principal emphasis, may be relevant to the prejudice which the State will suffer by the disclosure of his identity and, thus, is a factor to be considered. Nevertheless, the mere fact that the informant has given erroneous information on one occasion is, of course, not necessarily dispositive of his over-all reliability as an informant (although it may have some bearing on the seriousness of the claim advanced by plaintiffs). As the Appellate Division properly observed, "not every misstatement or inaccuracy by an informer will necessarily result in the scales balancing towards a divulging of his identity." 125 *N. J. Super.* at 410. It should be noted that in this case, while it is agreed that the affidavit was erroneous, it has not yet been established that the information provided by the informant was erroneous.

While our discussion thus far recognizes the often vital law enforcement services which are performed by informers, it would be naive to suppose that the privilege of nondisclosure of confidential sources of information may not be the source of potential abuse. In the context of the present case, one such possibility is the naked assertion by the State that no facts bearing on the interests of the government in maintaining the confidentiality of the informer can be

disclosed because the facts themselves are confidential in nature. The motive for such an assertion in response to claims for damages for a mistaken search and seizure is obvious. Equally apparent is the difficult nature of plaintiff's task in proving his case if no facts bearing on the informer's activities, or existence, are disclosed.

In our view, basic considerations of fairness which ultimately circumscribe the informer's privilege, require that in civil cases, when disclosure of a confidential informer's identity is vital to a party's case, the respective interests must be balanced as contemplated by *Roviaro, supra, Burnett, supra,* and *Oliver, supra,* and a decision reached as to anonymity or disclosure. Such considerations may require that the identity of the informant be disclosed to a party in a civil suit under some circumstances. Nevertheless, this is a step to be taken with caution and only with full appreciation of all the consequences.

The judgment of the Appellate Division is affirmed as modified.

*For affirmance as modified* — Justices JACOBS, HALL, MOUNTAIN, SULLIVAN and PASHMAN—5.

*For reversal*—None.