732 A.2d 540 (1999)
323 N.J. Super. 141
Mark VAN ENGELEN and Michael Curcio, Plaintiffs-Respondents,
v.
Dennis O'LEARY and William Geffken, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued February 16, 1999.
Decided July 13, 1999.
*542 Sharon H. Moore, Clinton, for defendants-appellants (Gebhardt and Kiefer, attorneys; Deborah B. Rosenthal, on the brief).
Anthony R. Mautone, West Orange, for plaintiffs-respondent Mark Van Engelen (Minichino and Mautone, attorneys; Mr. Mautone, on the brief).
Michael Critchley, West Orange, for respondent Michael Curcio (Mr. Critchley joined in the brief of plaintiff-respondent Van Engelen).
Before Judges SKILLMAN, PAUL G. LEVY and LESEMANN.
*541 The opinion of the court was delivered by LESEMANN, J.S.C. (temporarily assigned).
Defendants, Dennis O'Leary, the former Prosecutor of Sussex County, and William Geffken, the former Chief of Detectives of Sussex County, appeal pursuant to leave granted from a Law Division order denying their motion for summary judgment dismissing plaintiffs' malicious prosecution complaint against them. The complaint alleges that defendants had brought about the indictment of plaintiff Michael Curcio, a police officer for the Borough of Sussex (which is in Sussex County), on drug charges and charges of destruction of evidence, and that of plaintiff Mark Van Engelen, Chief of the Sussex Borough Police Department, for alleged complicity in the destruction of evidence. Plaintiffs charged that defendants obtained the indictment because Curcio had filed charges against patrons of a tavern known as Captain Bill's Bar, which was owned by William Morrison, a former client of O'Leary and an acquaintance of Geffken, and they wanted to protect and assist Morrison.
A primary issue (besides the question of whether defendants' actions constitute malicious prosecution) is whether the immunity granted by N.J.S.A. 59:3-8 (a part of the New Jersey Tort Claims Act) for "instituting or prosecuting" a judicial or administrative proceeding applies here, or whether it is rendered inapplicable by N.J.S.A. 59:3-14, which says that no immunity applies where a public official's conduct "was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct."
We conclude that under the standards of Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995), summary judgment should have been granted since the evidence submitted was insufficient "to permit a rational fact finder" to conclude that O'Leary and Geffken had acted for improper motives; that at most plaintiffs demonstrated mistaken judgment by defendants, and that, accordingly, the complaint was properly dismissed.
O'Leary became Sussex County Prosecutor on February 1, 1991. In his deposition he acknowledged that when he assumed his position, he had limited criminal experience. Partly to compensate for that limitation, he appointed Geffken as his Chief of Detectives. O'Leary said he had regarded himself as a "lawyer" rather than a "cop," whereas Geffken had long experience as a State Police officer and would be regarded as a "cop" within the Prosecutor's office.[1]
So far as appears, O'Leary's and Geffken's tenure was relatively smooth until January 10, 1992, when a melee broke *543 out in Captain Bill's Bar in Sussex Borough. William Morrison, who owned the tavern, had been a client of O'Leary's before O'Leary became Prosecutor. Both said that O'Leary had performed some miscellaneous tasks for Morrison over the years, the last of which had been preparation of a deed in 1988. O'Leary, however, had continued as registered agent for Morrison's corporation after he became Prosecutor.
The incident at Captain Bill's was reported in the press and received considerable local attention. Police from other municipalities had assisted and Curcio had played a major role in the event. At one point he removed the liquor license from the wall and took it with him. In his deposition he indicated that he thought he had a right to do that, that such action was standard procedure, and that it would result in an immediate closing of the bar. He also testified that on the day after the raid, the Mayor of Sussex Borough told him to return the license.
On January 13, 1992, the Monday following the weekend raid, O'Leary convened a meeting with Geffken, Van Engelen and Curcio. According to the plaintiffs, O'Leary indicated that his office would follow-up on the Captain Bill's incident and the Borough Police Department, which consisted only of Chief Van Engelen and three officers (Curcio and two others), would not be required to do so.
Five days later, on January 18, 1992, O'Leary wrote a letter to the Mayor and Council of Sussex Borough, sending a copy to the local news media. In view of the claim that O'Leary's motivation throughout was to assist Morrison, it is worth reproducing that letter in its entirety:
January 18, 1992
Mayor Peter Horvath & Council
Sussex Borough Municipal Building
2 Main Street
Sussex, NJ 07461
RE: Captain Bill's
Dear Mayor and Council:
The incidents which occurred at Captain Bill's Tavern on January 10, 1992 are reprehensible and demand the strongest action on your part. When the situation reaches the point where police are physically thrown out of a bar when attempted [sic] to enforce the law, it is time for the authorities to take immediate action. I am advised by the local police that this is a common occurrence and I am sure you agree with me that this should be brought to an immediate halt.
The attitude, as articulated by one of the bartenders that the police do not run the town, "We do" is disturbing and perhaps best sums up not only the philosophy of the lawless element which apparently hangs out in this establishment but also is the best reason for the Mayor and Council to take the swiftest and sternest possible action. I enclose a copies of relative portions of police reports of recent incidents for your review.
In addition, members of my office faced an angry and intoxicated mob in Captain Bill's about three weeks ago when they went in to make a drug arrest.
Clearly a major problem in Sussex Borough is an inordinate use of alcohol and drugs. This must end now! It is clear that drastic measures have to be taken to "retake" the borough from the lawless element that has established such a strong presence in the community. I intend to begin a concerted campaign by law enforcement to this end. I am sure the responsible citizens of Sussex Borough support this and I trust we will have your cooperation and assistance.
I am committed to this end and I am sure you share this commitment with me. A first step in that direction is by the Mayor and Council imposing a substantial license suspension or revocation in this case.
Very truly yours,
Dennis O'Leary
*544 cc: Joseph Pojanowski, Esq. By FAX: 471-0512
All Local Media
It is difficult to see how the Prosecutor could have been more emphatic in his demand for stern action concerning Captain Bill's and its liquor license.
A few weeks after the Captain Bill's incident, Daniel Mayer and Cheryl Viars, who occupied a room in the Sussex House Hotel, said that Curcio had come to their room and smoked cocaine in their presence. Viars also said that Curcio had asked her for sex in exchange for cocaine, but she had turned him down.
Viars first made those statements to Cindy, a bartender at Captain Bill's, in early February 1992. She said that Curcio had met Mayer earlier in the day and had arranged to come to their room, which he did about 2:00 a.m. He brought cocaine with him and smoked it, although neither Viars nor Mayer joined him in the drug use.
Cindy Klein passed that information to her employer, William Morrison. Morrison then asked Viars if she had really said that about Curcio and if so whether it was true. Viars assured Morrison it was true.
Morrison then called O'Leary and passed the information to him. O'Leary referred Morrison to the Chief of Detectives, Geffken, and Morrison then talked to Geffken. When asked before the Grand Jury why he had called the Prosecutor rather than the local police, Morrison responded that he had no confidence in the Borough Police.
Geffken received that information from Morrison on February 21, 1992. Later that day, Morrison again called Geffken. This time he said Viars was present in his bar and he had Viars speak directly to Geffken. Viars then repeated what she had said earlier about Curcio coming to her and Mayer's room and "doing cocaine." Geffken arranged a meeting with Viars for the following Monday at a local diner, but when Geffken and an investigator from his office went to the dinner, Viars failed to appear.
Geffken also said that after receiving this information about Curcio, he contacted Paul Kelly, Chief of Police in Union City, where Curcio had worked before coming to Sussex Borough. Kelly told Geffken that while Curcio was a police officer in Union City, he had become "involved with drugs, tested positive for use during an Amnesty Program, entered an inpatient drug rehabilitation center, but left without completing the program and was subsequently terminated from the Union City Police Department."
On February 28, 1992, Geffken met with Chief Van Engelen. Van Engelen acknowledged that over the last three weeks, he had heard rumors of Curcio's involvement with cocaine. Nevertheless, he had done nothing to investigate those rumors until about one hour ago. He also told Geffken that Curcio had been one of the persons with access to the police evidence locker and Van Engelen had done nothing to curtail that access or inventory any drugs in the locker.[2] Further, Van Engelen told Geffken that earlier that very day, Curcio and two other Sussex Borough officers had destroyed the narcotics evidence that had been "video taped," but there was no indication that the narcotics had been inventoried before being destroyed. Van Engelen also said he had approved the destruction and that the action was consistent with authorization from Investigator Cohen of the Prosecutor's Office. Cohen later denied that statement.
On February 29, 1992, Geffken obtained a sworn statement from Mayer, essentially repeating his earlier charge of Curcio's use of cocaine in the Sussex House. Geffken gave that additional information to *545 O'Leary and also advised O'Leary of Van Engelen's disclosure that the contents of the evidence locker had been destroyed. O'Leary confirmed that information with Van Engelen, and when he had done so, advised Van Engelen that the Prosecutor's Office was superceding the Sussex Borough Police Department effective immediately, and that Van Engelen and his entire department were suspended. O'Leary then had the Prosecutor's Office assume the functions of the Borough Police Department.
At or about that same time, O'Leary had the entire Curcio/Van Engelen matter submitted to the Grand Jury. In his deposition he testified that he did so primarily to have the Grand Jury investigate the matter and not with the intent of obtaining an indictment. He also noted that it was an assistant prosecutor, rather than O'Leary himself, who made the actual presentation to the Grand Jury.
That presentation included testimony by Viars and Mayer and also by Morrison and Geffken concerning statements made to them by Viars and Mayer. In addition, Captain Edward Driscoll, a Prosecutor's investigator, told the Grand Jury that a resident of the Sussex House, one Robert Beguin, had described Curcio's knocking on Mayer's door on the night when Mayer and Viars said he had come to their room to smoke cocaine. According to Driscoll, Beguin also said he had seen Curcio in Mayer's room that night, that Curcio looked like he was in the process of using cocaine, and that the next day Mayer told him that Curcio had in fact been ingesting cocaine in Mayer's room the night before. Driscoll further testified that another Sussex House resident, Joseph Caron, had also said that Mayer had told him about "doing cocaine" with Curcio. Another witness, Marcranda, also described Curcio coming to Mayer's place of employment looking for Mayer.
On April 9, 1992, Curcio and Van Engelen were indicted, Curcio on nine counts, including possession and distribution of cocaine, destruction of physical evidence, tampering with a witness, hindering his own prosecution, misconduct in office and theft of property. Van Engelen was charged with hindering a criminal prosecution and misconduct in office.
On September 8, 1992, Sussex County Assignment Judge Reginald Stanton denied defendants' motion to dismiss the indictments. The State proceeded to trial against Curcio and on February 8, 1994, a jury found Curcio not guilty of all the charges against him. The Prosecutor's office then dismissed the charges against Van Engelen.
In February 1995, Van Engelen filed suit in the United States District Court against O'Leary, Geffken, Sussex County, the Borough of Sussex and William Morrison. In August 1995, Curcio did the same. In February 1996, those two matters were dismissed for lack of federal jurisdiction and almost immediately thereafter Curcio and Van Engelen filed the present complaints against O'Leary, Geffken and Morrison. Answers were filed, discovery proceeded, and in early 1998 the defendants moved for summary judgment dismissing the complaints. On March 6, 1998, the Law Division denied that motion and on March 13, 1998, it denied defendants' motion for reconsideration. We then granted leave to appeal.

I
Two provisions of the New Jersey Tort Claims Act are significant in resolving the immunity issues in this case: N.J.S.A. 59:3-8, which contains a grant of immunity, and N.J.S.A. 59:3-14a, which removes that immunity when a public employee acts for some improper private motive. N.J.S.A. 59:3-8 provides that,
A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment. *546 N.J.S.A. 59:3-14a, however, establishes what our Supreme Court has termed an "outer limit" for that immunity, Tice v. Cramer 133 N.J. 347, 375, 627 A.2d 1090 (1993), by providing that,
Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or wilful misconduct.[3]
It is that latter provision which plaintiffs claim applies here and serves to remove whatever immunity O'Leary and Geffken might otherwise have enjoyed under N.J.S.A. 59:3-8. Their claim is that O'Leary (and Geffken) acted not for proper prosecutorial reasons, but rather to assist Morrison and protect him from legitimate law enforcement efforts by Curcio and Van Engelen. If supported by the evidence, we are satisfied that such actions would constitute "actual fraud, actual malice or wilful misconduct" within the meaning of N.J.S.A. 59:3-14(a).[4]
The issue, therefore, is whether plaintiffs, in opposing defendants' motion for summary judgment, satisfied their obligation under Brill v. Guardian Life Ins. Co., of America, 142 N.J. 520, 666 A.2d 146 (1995), to present "competent evidence" which, viewed in the light most favorable to plaintiffs, was "sufficient to permit a rational fact finder" to conclude that O'Leary's and Geffken's actions constituted "actual fraud, actual malice or willful misconduct."
We are satisfied that there is not sufficient evidence to support a rational conclusion that either O'Leary or Geffken acted for any such improper motive. In fact, there is virtually no evidence to support plaintiffs' contention. Their claims are based primarily upon speculationand speculation that is not very convincing.
Turning first to O'Leary, we note that carelessness or poor decision making do not constitute "actual fraud, actual malice or wilful misconduct." Those terms connote "commission of a forbidden act with actual ... knowledge that the act is forbidden." Marley v. Borough of Palmyra, 193 N.J.Super. 271, 294-95, 473 A.2d 554 (Law Div.1983); see also, Fielder v. Stonack, 141 N.J. 101, 123-27, 661 A.2d 231 (1995). There is nothing to support such a conclusion here. To the contrary, the facts which justified O'Leary's actions are virtually overwhelming. He was presented with two witnesses who swore they saw Curcio use cocaine. Of her own volition, one of those persons, Cheryl Viars, passed that information to several others. Curcio's otherwise unexplained connection with Mayer and Viars on the night in question was confirmed by the testimony of one witness (Marcranda) who *547 described Curcio coming to Mayer's place of employment looking for Mayer, and by two others to whom Mayer described Curcio's cocaine activities. One of them also saw Curcio in Mayer's room, engaged in what seemed to be cocaine ingestion.
O'Leary also learned that Curcio had a cocaine problem which had led to his dismissal from the Union City Police Department. In addition, Curcio had access to cocaine stored in the evidence locker and participated in destroying that evidence at a time when the Prosecutor's office was investigating the charges against him.
As to Van Engelen, he acknowledged that he had done nothing to investigate three-week-old rumors of Curcio's cocaine involvement. He had not inventoried or secured the evidence locker and had continued to permit Curcio free access to the locker contents. And during the very time that the Prosecutor's office was investigating charges against one of his officers, he authorized the destruction of all the evidence held by the Borough.
In the face of those facts, plaintiffs' only basis for asserting that O'Leary acted from improper motives is his former representation of William Morrison. That seems a remarkably tenuous motive for the extraordinary conduct with which O'Leary is charged. The last services O'Leary had performed for Morrison were a few years before he became Prosecutor. He had remained registered agent for Morrison's corporation, a position he probably should have avoided, but something which hardly seems a motive to do what he is charged with doing here.
Plaintiffs do not clearly articulate their theory as to what O'Leary intended to accomplish by his asserted pillorying of Curcio and Van Engelen. Curcio had apparently filed complaints against a number of patrons in Morrison's bar. It is not clear that any of those complaints would have had an adverse effect on Morrison himself. What is clear is that a suspension of Morrison's liquor license for a substantial time, or a revocation of that license, would certainly have had such an effect. And by his letter to the Mayor and Council, O'Leary took a strong position in favor of just such a suspension or revocation. One reading that letter could hardly doubt that the Prosecutor was leaning hard on the governing body to move strongly against Morrison.
In sum, while it is possible to speculate that O'Leary acted for some improper motive, there is not sufficient evidence in the record to enable a reasonable fact finder to reach such a conclusion. The contrary conclusion is far more likely: that O'Leary acted from legitimate, well-meaning concerns as a prosecutor. That conclusion is consistent with his demand for stern action against Morrisonthe man plaintiffs claim he was trying to help. His actions respecting Curcio and Van Engelen were eminently reasonable and certainly understandable. In addition, even assuming some motive for O'Leary to persecute Curcio, we see no theory explaining such action against Van Engelen. Nor do plaintiffs supply such a missing motive.
There is, then, simply no realistic evidence to support a finding that O'Leary acted for any improper motive and thus, under Brill the motion judge should have granted the summary judgment motion to dismiss the complaint against him.
As to Geffken, we note first that the immunity provided by N.J.S.A. 59:3-8 covers a "public employee" and provides immunity for "instituting or prosecuting" a judicial or administrative proceeding. There is no reason that immunity should not apply to Geffken, who functioned as Chief of Detectives in the Prosecutor's office. Thus, the same issue arises with Geffken as arose with O'Leary: was there sufficient evidence to justify a conclusion that the immunity which Geffken would otherwise enjoy was lost because he acted through "actual fraud, actual malice or willful conduct," or "based upon personal predilection or gain" or for "personal reasons" of his own?
*548 The answer respecting Geffken is even clearer than that concerning O'Leary. The wrongdoing plaintiffs allege against Geffken seems to consist of his collaboration with O'Leary in effecting plaintiff's indictment but it is not clear what they say Geffken did in that regard. It is acknowledged that Geffken played no part in O'Leary's disbanding the Sussex Borough Police Department.
Further, if the claimed motivation for improper actions by O'Leary was tenuous, that concerning Geffken was nonexistent. In pretrial discovery plaintiffs explored Geffken's relationship with William Morrison and established only that the two were acquaintances but had no social or business relationship. Plaintiffs also learned that Morrison's brother had been a State Police officer at the same time that Geffken was with the State Police, but again, there was no significant relationship between the two and nothing to suggest any motive for Geffken to assist Morrison.
In short, the reasoning which leads to the conclusion that summary judgment should have been granted to O'Leary applies even more strongly to Geffken and requires that the complaint against Geffken be dismissed.
Finally, plaintiffs' argue that O'Leary should have presented certain exculpatory evidence to the grand jury which indicted plaintiffs. In discussing that claim, it bears repeating that even if the claim is true, it does not render the statutory immunity inapplicable unless it bespeaks a deliberate action, taken for O'Leary's own improper purposes. Carelessness, unreasonable conduct or even noncompliance with substantive law would not have that effect.
State v. Hogan, 144 N.J. 216, 676 A.2d 533 (1996), outlines the circumstances under which a prosecutor is required to present so-called exculpatory evidence to a grand jury. The Court there described that obligation as a limited one. It said the obligation was to present "evidence that directly negates the guilt of the accused." Id. at 237, 676 A.2d 533. That limited obligation, said the Court,
recognizes that the sole issue before the grand jury is whether the State has made out a prima facie case of the accused's guilt. Thus, unless the exculpatory evidence at issue squarely refutes an element of the crime in question, that evidence is not within the prosecutorial duty ... [of disclosure].

[Ibid.]
Evidence that a witness recanted prior testimony normally need not be presented to the grand jury:
"[R]ecantation testimony is generally considered exceedingly unreliable".... Partly because recantations are often induced by duress or coercion, ... the sincerity of a recantation is to be viewed with "extreme suspicion."
[Id. at 239, 676 A.2d 533.](citations omitted)
In Hogan, the Court rejected a claim that the prosecutor failed in his obligation to present recantation testimony to the grand jury. The Court commented that the evidence in question "was highly unreliable evidence" and concluded that determination of the impact of the recantation "was a responsibility properly reserved for the petit jurors...." Id. at 240, 676 A.2d 533.
The exculpatory evidence to which plaintiffs refer here falls squarely within that description. It dealt with the alleged recantation of Mayer and Viars. It certainly did seem unreliable, as both witnesses seemed to change their stories from time to time.[5] Under Hogan, there was no obligation to present that conflicting testimony to the grand jury. O'Leary complied with his obligation and the nonpresentation *549 of the recantation and later vacillations of the two witnesses did not demonstrate the subjective bad faith, actual malice or fraud required to invalidate O'Leary's statutory immunity.

II
Defendants are entitled to summary judgment not only because of the immunity discussed above, but also because plaintiffs did not demonstrate the existence of the necessary elements to sustain a malicious prosecution claim. In Lind v. Schmid, 67 N.J. 255, 262, 337 A.2d 365 (1975), the court listed the four elements necessary to ground a malicious prosecution complaint. There must be proof:
(1) that the criminal action was instituted by the defendant against the plaintiff, (2), that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff.

[Ibid.]
Here, we may accept items (1) and (4) as having been established. Items (2) and (3), however, were not established at all. For all of the reasons noted above, there was no showing that the indictments of Curcio and Van Engelen were "actuated by malice." For those same reasons, we are satisfied that there was more than sufficient "probable cause" for the proceeding. With two of the four critical elements of the asserted cause of action missing, there was no basis to maintain the complaint and thus, for that reason as well, summary judgment should have been granted to defendants, dismissing the complaints against them.
The orders appealed from are reversed and the matter is remanded to the trial court for entry of summary judgment in favor of defendants.
NOTES
[1] O'Leary also noted that many Sussex County municipalities do not have municipal police departments and are served by the State Police. He felt that Geffken's State Police background would be useful in that respect.
[2] There was some indication that the cocaine Curcio allegedly took to the Sussex House was contained in an envelope that resembled a police evidence envelope.
[3] The statutory immunity granted by the Tort Claims Act is not in fact significantly different from that established by the pre-existing common law. In Cashen v. Spann, 66 N.J. 541, 334 A.2d 8 (1975), which was decided after the Tort Claims Act was adopted but involved actions which predated the Act, the Supreme Court spoke of that similarity and noted that the pre-statute law provided prosecutorial immunity, but it was not "unqualified." It did not apply, the Court said, when the prosecutor's actions were "based upon personal predilection or gain" or when prosecutors acted "for personal reasons of their own." Id. at 550, 334 A.2d 8. Absent such improper motives, however, the immunity did apply:

It is only such acts [motivated by personal reasons or personal predilection or gain] which are redressable in actions for malicious prosecution and malicious abuse of process.
[Ibid.]
See also, generally to the same effect, Burke v. Deiner, 97 N.J. 465, 479 A.2d 393 (1984); Hayes v. Mercer County, 217 N.J.Super. 614, 526 A.2d 737 (App.Div.), certif. denied, 108 N.J. 643, 532 A.2d 226 (1987); River Edge Savings and Loan Ass'n v. Hyland, 165 N.J.Super. 540, 398 A.2d 912 (App.Div.), certif. denied, 81 N.J. 58, 404 A.2d 1157 (1979),
[4] They would also meet the common law standard of actions "based upon personal predilection or gain," or actions taken "for personal reasons" and not for legitimate law enforcement reasons, and thus, were we dealing with immunity as it existed before the Tort Claims Act, that immunity also would be lost.
[5] In his deposition O'Leary said that he believed the original stories of Viars and Mayer. The prosecutor's trial problems arose primarily because Mayer subsequently "fell apart," O'Leary said, whereas Viars remained relatively steady.