

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-26-1996

# Coleman-Fletcher v. Kaye

Precedential or Non-Precedential:

Docket 95-5439,95-5469,95-5708,95-5742

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Coleman-Fletcher v. Kaye" (1996). *1996 Decisions.* Paper 163.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/163

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 95-5439/5469/5708/5742


BARBARA COLEMAN,
              Appellant Nos. 95-5439/5742

v.

JOHN KAYE, Individually, and
in his capacity as Monmouth County
Prosecutor; COUNTY PROSECUTOR'S OFFICE OF
THE COUNTY OF MONMOUTH; JOHN DOES, 1-100;
JANE DOES, 1-100

COUNTY OF MONMOUTH,
                         Intervenor in D.C.


BARBARA COLEMAN

v.

JOHN KAYE, Individually, and
in his capacity as Monmouth County
Prosecutor; THE COUNTY PROSECUTOR'S
OFFICE OF THE COUNTY OF MONMOUTH; JOHN DOES,
1-100; JANE DOES, 1-100

COUNTY OF MONMOUTH
          Intervenor in D.C.

John Kaye,
     Appellant Nos. 95-5469/5708


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 91-cv-01140)

Argued April 29, 1996
BEFORE:  COWEN and ROTH, Circuit Judges
and CINDRICH, District Judge*


*Honorable Robert J. Cindrich, United States District Judge for the
Western District of Pennsylvania, sitting by designation.

(Filed  June 26, 1996 )

Linda B. Kenney (argued)
Gregory S. Schaer
Law Offices of Linda B. Kenney
2 Bridge Avenue
The Galleria, Atrium Building
#5, 2nd Floor
Red Bank, New Jersey  07701

        Counsel for Appellant/Cross Appellee
        Barbara Coleman

Arlin M. Adams (argued)
Nancy Winkelman
Schnader, Harrison, Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA  19103

        Counsel for Appellees/Cross Appellants
        John Kaye, County Prosecutor's Office
        of the County of Monmouth; John Does, 1-100;
        Jane Does, 1-100

Malcolm V. Carton (argued)
Carton & Faccone
514 Garfield Avenue
P.O. Box 97
Avon, New Jersey  07717

        Counsel for Appellee
        County of Monmouth

                        OPINION


COWEN, Circuit Judge.

        Plaintiff-appellant Barbara A. Coleman appeals an order
of the district court granting defendant-appellee Monmouth County's
posttrial motion to vacate a jury verdict of $15,000 in
compensatory damages and $350,000 in punitive damages based upon
three findings of intentional sex discrimination.  The principal
questions we must decide are whether county prosecutors in New
Jersey act as state or county officials when they make personnel
decisions and whether the district court properly exercised in
personam jurisdiction.  We hold that county prosecutors act on
behalf of the county in this setting.  We further hold that the
County of Monmouth has waived any defense of lack of personal
jurisdiction.  See Fed. R. Civ. P. 12(h)(1).  Accordingly, we will
reverse the May 4, 1995 order of the district court vacating the

jury verdict against the County of Monmouth.

The jury also found Prosecutor Kaye to be liable in his individual capacity for $10,000 in compensatory damages and $50,000 in punitive damages. Kaye appeals the district court's denial of his Rule 50(b) motion for judgment as a matter of law on the ground of evidentiary insufficiency. As we find sufficient evidence in the record to support a finding of liability against Kaye for both compensatory and punitive damages, we will affirm the district court's denial of Kaye's motion. Furthermore, since the jury verdict against the County of Monmouth must be reinstated, liability for the payment of attorneys' fees must be apportioned between Kaye and the County of Monmouth, and we will remand the matter for further proceedings consistent with this opinion.

I.

Barbara Coleman was employed as an investigator at the Monmouth County Prosecutor's Office during John Kaye's tenure as Monmouth County Prosecutor. As County Prosecutor, Kaye had plenary authority in deciding whom to hire, fire, promote or demote at the Monmouth County Office. Although Kaye received input from subordinates as to the qualifications of persons considered for promotion, it is uncontested that he possessed the final authority to determine who worked for the Monmouth County Prosecutor and in what capacity.

Coleman applied for promotions at the Monmouth County Prosecutor's Office in May of 1989, June of 1990 and October of 1990. In May of 1989 Coleman sought to be promoted to either sergeant or lieutenant. She was not promoted to either position. Similarly, Coleman's applications to be promoted to sergeant were denied in both June and October of 1990. On all three occasions, a male investigator was promoted over Coleman.

On March 12, 1991, Coleman filed a complaint in the District Court for the District of New Jersey naming as parties John Kaye, individually and in his official capacity as Monmouth County Prosecutor, the County Prosecutor's Office of the County of Monmouth, John Does 1-100 and Jane Does 1-100. The County of Monmouth was not named separately as a defendant. The complaint alleged that the defendants had discriminated against Coleman based upon her sex by failing to promote her to sergeant (three times) and lieutenant (once) on various occasions in 1989 and 1990. Coleman brought claims under 42 U.S.C. 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and pendent state claims under the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. 10:5-1 et seq. The summons and complaint were served upon Kaye, who also accepted service on behalf of the Monmouth County Prosecutor's Office.

This matter proceeded to trial in district court on September 20, 1994. On September 29, 1994, the case was sent to the jury, which made the following pertinent factual findings: (1) Prosecutor Kaye had intentionally discriminated against Coleman based upon her sex by not promoting her to sergeant in June of 1990 and October of 1990; (2) the County of Monmouth did not adopt a policy or custom of sex discrimination that resulted in Coleman not being promoted in May of 1989, June of 1990 or October of 1990;

(3) Kaye and/or one or more of his subordinates who made recommendations to him intentionally discriminated against Coleman because she was a woman, and such discrimination proximately caused her to be passed over for promotion in May of 1989, June of 1990 and October of 1990; and (4) Kaye and/or one of his subordinates did not intentionally discriminate against Coleman in retribution for her filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). The jury's award of compensatory and punitive damages against both the County of Monmouth and Prosecutor Kaye was based upon these findings. The verdict sheet that the district court submitted to the jury to record its findings provided no separate section in which it could articulate the precise grounds upon which the parties had been held liable.

Faced with the prospect of paying a substantial damages award, the County of Monmouth filed a motion to intervene pursuant to Fed. R. Civ. P. 24, which was granted by the district court. Monmouth County also filed a motion pursuant to Fed. R. Civ. P.60(b)(4) to vacate the jury verdict. The County argued that the jury verdict should be vacated because Coleman had not properly effected service of process upon the County. It also contended that Prosecutor Kaye is a state official over whom the County exercised no control. Monmouth County maintained that New Jersey law requires a finding of "control" in order for it to be held liable in damages under the LAD. The County argued that since it had no control over Kaye's personnel decisions, then a fortioricounty prosecutors in New Jersey are not agents of the counties they serve. Thus, Monmouth County argued that even if county prosecutors engage in acts of intentional discrimination against their own employees, such conduct nonetheless cannot expose the counties to liability under the LAD.

The district court found the County of Monmouth's arguments to be convincing and granted its motion to vacate Coleman's jury verdict against the County on two alternative grounds. The district court held that it had lacked in personamjurisdiction to enter a judgment against the County of Monmouth because it had not been served properly under either Fed. R. Civ. P.4(j)(2) or N.J. Ct. R. 4:4-4(a)(8), the local procedural rule to which Rule 4(j) refers. Alternatively, the district court found that the County of Monmouth could not be held liable under the New Jersey LAD premised upon a theory of respondeat superior for the actions of Prosecutor Kaye. Applying the agency principles adopted by the New Jersey Supreme Court in Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445 (N.J. 1993), the district court held that there was no master/servant relationship between the County of Monmouth and Prosecutor Kaye. On the contrary, the district court concluded that "county prosecutors are controlled by the Attorney General for the State of New Jersey[,] a member of the New Jersey executive branch of government." Coleman v. Kaye, No. 91-1140, slip op. at 7 (D.N.J. May 4, 1995).

Prosecutor Kaye responded to the October 17, 1994 jury verdict against him by filing a Fed. R. Civ. P. 50(b) motion for judgment as a matter of law, arguing that there was insufficient evidence in the record to support a finding that he had discriminated against Coleman. Kaye also argued that there was an

insufficient foundation in the record to support an award of either compensatory or punitive damages against him. The district court denied Kaye's Rule 50(b) motion in its May 4, 1995 order.

On September 7, 1995, the district court granted Coleman's application for attorneys' fees and costs. The order provided that Coleman's counsel be awarded $101,184.00 in attorneys' fees and $3,968.92 in costs. Since the County of Monmouth had already been dismissed from this action, Prosecutor Kaye was ordered to pay the entire sum of $105,152.92. This appeal followed.

## II.

The district court had jurisdiction pursuant to 28 U.S.C. 1331, 28 U.S.C. 1343(a)(3) and 28 U.S.C. 1367. We have jurisdiction under 28 U.S.C. 1291. We exercise plenary review over jurisdictional issues. Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1002 (3d Cir. 1992). Our review of the district court's interpretation and application of state law is plenary, Hofkin v. Provident Life & Accident Ins. Co., 81 F.3d 365, 369 (3d Cir. 1996), as is our review of a denial of a motion for judgment as a matter of law. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). A Rule 50(b) "motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Id.

Punitive damages may be awarded for violation of the New Jersey LAD "when the wrongdoer's conduct is especially egregious." Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 464 (N.J. 1993) (quoting Leimgruber v. Claridge Assocs., 375 A.2d 652, 654 (N.J. 1977)). Therefore, "the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference." Id. Similarly, punitive damages may be awarded under 42 U.S.C. 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640 (1983).

"We review the reasonableness of an award of attorney's fees for an abuse of discretion." Rode v. Dellarciprete, 892 F.2d 1177, 1182 (3d Cir. 1990). Our review is plenary "when a district court fails to apply the appropriate standards for granting legal fees . . . ." Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc.–Pension Fund v. Centra, 983 F.2d 495, 508 (3d Cir. 1992).

## III.

Although Coleman's suit against the County of Monmouth and Prosecutor Kaye arose from the same underlying facts, the claims that the defendants raise on appeal require the resolution of entirely different issues. We will therefore address their various contentions in separate sections. First, we will address Coleman's appeal, which assails the two grounds upon which the district court vacated the jury verdict against the County of

Monmouth.

A.

The district court relied upon Fed. R. Civ. P. 4(j)(2) and New Jersey Court Rule 4:4-4(a)(8) to support its conclusion that the court lacked in personam jurisdiction over Monmouth County. Rule 4(j)(2) provides that

> [s]ervice upon a state, municipal corporation, or other governmental organization subject to suit shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state for the service of summons or other like process upon any such defendant.

Fed. R. Civ. P. 4(j)(2). The manner of service prescribed under the local New Jersey rules is set forth in N.J. Ct. R. 4:4-4(a)(8), which provides, in relevant part, that service must be effected "by serving a copy of the summons and complaint . . . on the presiding officer or on the clerk or secretary thereof." Reading these two provisions together, the district court concluded that since Kaye "is not the presiding officer, clerk or secretary of the County of Monmouth . . . plaintiff did not properly effect service of the summons and complaint upon the County of Monmouth." Coleman v. Kaye, No. 91-1140, slip op. at 4 (D.N.J. May 4, 1995). As such, the court concluded that "the jury's verdict . . . against the County of Monmouth cannot stand." Id.

The district court was correct to the extent that it concluded that Kaye did not fit the proper description of anyone designated to receive service of process on behalf of the County of Monmouth under either Rule 4(j) or N.J. Ct. R. 4:4-4(a)(8). Moreover, as we explained in Grand Entertainment Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 492 (3d Cir. 1993), "[a] district court's power to assert in personam authority over parties defendant is dependent not only on compliance with due process but also on compliance with the technicalities of Rule 4." This analysis is not controlling, however, when a party submits itself to the jurisdiction of the district court, thereby waiving any claim that the district court lacked in personam jurisdiction. SeeFed. R. Civ. P. 12(h)(1). This is exactly what happened here.

The County of Monmouth became involved in this lawsuit both before and after Coleman filed her complaint in district court. For example, before commencing the present action in district court, Coleman submitted a complaint to the EEOC. Monmouth County elected to respond to Coleman's EEOC complaint. Assistant Monmouth County Counsel Robert Hrebek sent a letter to Joe G. Rosenberg, the Supervisory Investigator of the EEOC, advising him that Hrebek had "been assigned to handle [this matter] on behalf of the Monmouth County Prosecutor by Malcolm V. Carton, Esq., Monmouth County Counsel. . . [and to] please direct all future correspondence in this case to my attention as Assistant County Counsel." App. at 145.

After Coleman filed her complaint, Special County Counsel Richard T. O'Connor sent a letter, dated August 12, 1993, to the

clerk of the court.  In this letter, O'Connor requested the clerk to

> enter the appearance of the firms of Gerald L. Dorf, P.C. and Malcolm V. Carton, Monmouth County Counsel, by Richard T. O'Connor, Special County Counsel, on behalf of Defendants John Kaye individually and in his capacity as Monmouth County Prosecutor and the County Prosecutor's Office of the County of Monmouth in the above-captioned matter.

Id. at 141.  The August 12, 1993 letter listed both O'Connor and Dorf as "Attorneys for Defendants John Kaye and the County Prosecutor's Office of the County of Monmouth."  Id.

At no time did representatives from the County Counsel's Office ever interpose an objection on jurisdictional grounds.  See 5A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure 1344, at 173 (2d ed. 1990) ("If defendant appears in the action, he must interpose any . . . objections he may have by motion or in his answer or they will be deemed waived by virtue of Rule 12(h)(1)."). Quite to the contrary, the representations made by attorneys from the County Counsel's Office indicate that Monmouth County was acutely aware of its possible exposure in this matter.  To illustrate, a letter dated March 3, 1992 sent by Special County Counsel O'Connor to Linda B. Kenney, Coleman's attorney, contains the following admission in the opening sentence:  "As you know, I represent Monmouth County in the above-captioned matter."  App. at 148 (emphasis added).  In addition, Special Counsel O'Connor noted in a letter memorandum to the district court dated January 3, 1991, that "[t]he County of Monmouth shall rely upon the legal arguments and contentions contained in its supporting brief . . . ."  Id. at 153 (emphasis added).

In addition to the foregoing, Assistant County Counsel Hrebek filed papers and motions in this action on behalf of Kaye and the Monmouth County Prosecutor's Office.  On April 30, 1991, Hrebek applied to the district court for an order granting the Monmouth County Prosecutor's Office a thirty-day extension to file an answer or a responsive pleading.  This letter listed Hrebek as the "Attorney for Defendants."  Id. at 611.  The district court granted Hrebek's motion.  Moreover, on May 28, 1991, Hrebek received an additional fifteen-day extension to file an answer on behalf of Kaye and the Monmouth County Prosecutor's Office. Assistant County Counsel Hrebek did not interpose the defense of lack of personal jurisdiction with respect to the County of Monmouth in any one these responsive pleadings.

Finally, on May 24, 1991, Gerald Dorf, Esq., entered an appearance on behalf of John Kaye "as an individual."  Id. at 609. Dorf was retained by Kaye with Monmouth County funds.  Given the County's pervasive involvement in the litigation of this matter and the County Counsel's Office's open acknowledgement that it was representing the County's interests, which by all appearances were indistinguishable from those of the Monmouth County Prosecutor's Office, we conclude that Monmouth County's defense of lack of personal jurisdiction had effectively been waived long before the

County, seemingly as an afterthought, filed its posttrial motion to vacate on jurisdictional grounds. We therefore hold that the County of Monmouth was properly before the district court as a party.

B.

The County of Monmouth also contends that it cannot be held accountable for Prosecutor Kaye's actions because he is a state official over whom the County exercises no control. The district court agreed, concluding that Prosecutor Kaye was controlled by the New Jersey State Attorney General. This is an issue of first impression, as the New Jersey Supreme Court has yet to address the specific issue of whether a county prosecutor acts as a state or county official when making personnel decisions at the county level.

A review of related authorities leads us to conclude that county prosecutors in New Jersey can be characterized as having a dual or hybrid status. It is well established that when county prosecutors execute their sworn duties to enforce the law by making use of all the tools lawfully available to them to combat crime, they act as agents of the State. On the other hand, when county prosecutors are called upon to perform administrative tasks unrelated to their strictly prosecutorial functions, such as a decision whether to promote an investigator, the county prosecutor in effect acts on behalf of the county that is the situs of his or her office. We therefore predict that the New Jersey Supreme Court, if presented with a case in this posture, would hold that county prosecutors are acting on behalf of the county when they make personnel decisions.

This conclusion requires us to reach a related issue. The district court determined that the application of agency principles, as set forth in the New Jersey Supreme Court's decision in Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445 (N.J. 1993), provided the analytical framework under which Coleman's claims against the County of Monmouth should be scrutinized. We disagree.

Neither the State nor the County of Monmouth exercised "control" over Prosecutor Kaye's personnel decisions. If Lehmann were held to be controlling in this context, this would lead to the untenable conclusion that Prosecutor Kaye was acting on behalf of neither the State nor the County of Monmouth when he passed over Coleman for promotion. We therefore hold that the application of strict agency principles is inappropriate in this setting. As the New Jersey LAD is intended to combat intentional discrimination, and given that intentional discrimination was perpetrated by county officials here, we predict that the New Jersey Supreme Court would hold that Kaye was the Monmouth County policymaker in regard to personnel actions in the prosecutor's office and that the County of Monmouth may be held liable for the acts of intentional discrimination that occurred.

1.

The New Jersey Supreme Court in Lehmann v. Toys 'R' Us, Inc., 626 A.2d at 445, set forth the applicable standard to determine whether an employer can be held liable under the LAD when an employee raises a hostile environment sexual harassment claim against a supervisor. Lehmann held that in this context,

respondeat superior liability would lie if the agency principles set forth in the Restatement (Second) of Agency   219-237 (1958) established the existence of a master-servant relationship.  To determine whether such a relationship is present, the Restatement calls for the application of a "control test."  See id.   220(1) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.");  see also Pollak v. Pino's Formal Wear & Tailoring, 601 A.2d 1190, 1196 (N.J. Super. Ct. App. Div.) ("[T]he relationship of master and servant exists whenever the employer retains the right to determine not only what shall be done, but how it shall be done.") (quoting De Monaco v. Renton, 113 A.2d 782, 783-84 (N.J. 1955)), certif. denied, 611 A.2d 646 (N.J. 1992).

Applying Lehmann, the district court concluded that it is "clear . . . that the County of Monmouth does not exercise sufficient control over Prosecutor John Kaye to establish a master-servant relationship.  Rather, county prosecutors are controlled by the Attorney General for the State of New Jersey[,] a member of the New Jersey executive branch of government."  Coleman v. Kaye, No. 91-1140, slip op. at 7 (D.N.J. May 4, 1995).  Thus, the court held that "the County of Monmouth cannot be held liable on a theory of respondeat superior for the actions of Prosecutor John Kaye."  Id. Since both the district court and the parties consider Lehmann to be the seminal case here, we will explore the issue of who can be said to "control" county prosecutors in New Jersey in some detail.

The office of county prosecutor in the State of New Jersey is a constitutionally established office.  The New Jersey Constitution provides that

> [c]ounty prosecutors shall be nominated and
> appointed by the Governor with the advice and
> consent of the Senate.  Their term of office
> shall be five years, and they shall serve
> until the appointment and qualification of
> their respective successors.

N.J. Const., art. VII,   2, par. 1.  The specific powers and authority of the county prosecutor are fully set forth in Title 2A of the New Jersey Revised Statutes.  Each county prosecutor is vested "with the same powers and [is] subject to the same penalties, within his county, as the attorney general shall by law be vested with or subject to . . . ."  N.J. Stat. Ann.   2A:158-5. The county prosecutor's oath of office requires that the appointee swear to faithfully execute the duties of the office "in and for" the county in which he or she has been appointed. Id.   2A:158-3.

County prosecutors in the State of New Jersey are fully and exclusively bestowed with appointment powers as to office staff and personnel.  Such appointment powers are delineated by law as follows:  Section 2A:158-15 authorizes a county prosecutor to appoint assistant prosecutors;   2A:157-2 authorizes the county prosecutor to appoint county detectives;   2A:158-18.1 empowers the prosecutor to appoint "legal assistants" in counties of the

first class; and 2A:157-10 provides for the appointment of investigators, such as Coleman, who are "to serve at [the county prosecutor's] pleasure . . . ."

Every year the board of chosen freeholders in each county appropriates funds to be used by the prosecutor's office. Id. 40:20-1. Expenses incurred by county prosecutors in carrying out their statutory duty to detect, arrest, indict and convict offenders of the criminal law are paid by the county treasurer. Id. 2A:158-7. The counties' role in financing the local prosecutors' offices is further exemplified by N.J. Stat. Ann. 2A:158-16, which provides that assistant prosecutors' annual salaries shall "be fixed by resolution of the board of chosen freeholders on the recommendation of the county prosecutor . . . ."

Similar to the county prosecutor, the New Jersey Attorney General is a constitutional officer pursuant to art. V, 4, 3 of the New Jersey Constitution. In furtherance of this constitutional authority, the New Jersey Legislature has established the Department of Law and Public Safety in the State's executive branch to be headed by the Attorney General. N.J. Stat. Ann. 52:17B-1-:17B-2. Pursuant to N.J. Stat. Ann. 52:17A-4, the Attorney General is the State's chief law enforcement officer. Section 52:17B-103 provides that

> [t]he Attorney General shall consult with and
> advise the several county prosecutors in
> matters relating to the duties of their office
> and shall maintain a general supervision over
> said county prosecutors with a view to
> obtaining effective and uniform enforcement of
> the criminal laws throughout the State. He
> may conduct periodic evaluations of each
> county prosecutor's office including audits of
> funds received and disbursed in the office of
> each county prosecutor.

N.J. Stat. Ann. 52:17B-103 (emphasis added). It thus appears that although the Attorney General "maintain[s] a general supervision over . . . county prosecutors," the principal concern of that oversight relates to the maintenance of an effective statewide law enforcement policy; i.e., "obtaining effective and uniform enforcement of the criminal laws throughout the State." Id.

New Jersey law also empowers the Attorney General to intervene in the criminal matters of a county under certain circumstances. Pursuant to N.J. Stat. Ann. 52:17B-104, the Attorney General is required to prosecute criminal matters for a county if it has no prosecutor. County prosecutors may also "request in writing the assistance of the Attorney General," but solely for the purpose of a "criminal investigation or proceeding." Id. 52:17B-105. The Attorney General may then "take whatever action he deems necessary to assist the county prosecutor in the discharge of his duties." Id.

The New Jersey Legislature has granted the Attorney General the discretionary authority of supersedure of a county prosecutor:

> [w]henever requested in writing by the

Governor, the Attorney General shall, and whenever requested in writing by a grand jury or the board of chosen freeholders of a county or the assignment judge of the superior court for the county, the Attorney General may supersede the county prosecutor for the purpose of prosecuting all of the criminal business of the State in said county, intervene in any investigation, criminal action, or proceeding instituted by the county prosecutor, and appear for the State in any court or tribunal for the purpose of conducting such investigations, criminal actions or proceedings as shall be necessary for the protection of the rights and interests of the State.

Whenever the Attorney General shall have superseded a county prosecutor as aforesaid, the county prosecutor, the assistant county prosecutors and other members of the staff of the county prosecutor shall exercise only such powers and perform such duties as are required of them by the Attorney General.

Id. 52:17B-106 (emphasis added). Thus, the Attorney General's supersedure power appears to have been bestowed with the understanding that it was intended to ensure the proper and efficient handling of the county prosecutors' "criminal business." Id. This point is further amplified by the companion law of N.J. Stat. Ann. 52:17B-107(a), which provides that

[w]henever in the opinion of the Attorney General the interests of the State will be furthered by so doing, the Attorney General may (1) supersede a county prosecutor in any investigation, criminal action or proceeding, (2) participate in any investigation, criminal action or proceeding, or (3) initiate any investigation, criminal action or proceeding. In such instances, the Attorney General may appear for the State in any court or tribunal for the purpose of conducting such investigations, criminal actions or proceedings as shall be necessary to promote and safeguard the public interests of the State and secure the enforcement of the laws of the State.

Id. 17B-107(a). Noticeably absent in the supersedure language in Title 52 is any reference to an intention of the part of the Legislature to authorize an act of supersedure simply for the purpose of managing routine personnel matters. Such concerns were obviously not a legislative priority.

We recognize that in cases where the Attorney General has

taken over the operation of a county prosecutor's office, either in case of supersedure or where a county has no prosecutor, the Attorney General would temporarily have the responsibility to make personnel decisions in the county office. With the exception of that extraordinary situation, which has no application here, the Attorney General does not possess oversight authority with respect to the day-to-day management of the county prosecutor's office. It would be an unwarranted extension of the implications of the Attorney General's supersedure authority to conclude that the mere possibility of its exercise can somehow serve to bring the conduct at issue in the instant case within the purview of the Attorney General's control.

The statutory and constitutional scheme that we have elaborated upon provides county prosecutors in the State of New Jersey with a substantial degree of autonomy from the State government in matters that do not involve the enforcement of the criminal laws of the State. The decision whether to promote an investigator falls within the exclusive province of the county prosecutor. We therefore hold that the district court erred in concluding that county prosecutors in New Jersey are agents of the State Attorney General when they make personnel decisions.

2.

Nor can the County of Monmouth be said to control Prosecutor Kaye's employment decisions. Indeed, attempts by various parties to interfere with county prosecutors' employment prerogatives have been rejected consistently by New Jersey courts. See Cetrulo v. Byrne, 157 A.2d 297 (N.J. 1960) (county board of chosen freeholders' appointment of a legal assistant to prosecutor beyond the scope of its powers); Zamboni v. Stamler, 489 A.2d 1169 (N.J. Super. Ct. App. Div. 1985) (rejecting Union County detectives' challenge to a reorganization plan that created superior officer positions within the unclassified civil service of the Prosecutor's investigative staff and enabled the Prosecutor to appoint detectives to serve temporarily in that capacity); cf. Bergen County Bd. of Chosen Freeholders v. Bergen County Prosecutor, 412 A.2d 130 (N.J. Super. Ct. App. Div. 1980) (upholding decision of the New Jersey Public Employment Relations Commission that the county prosecutor, and not the board of chosen freeholders, is the employer of his subordinates in the county office for purposes of labor relations and collective bargaining).

Moreover, New Jersey courts have held that the county prosecutor enjoys a significant degree of autonomy from the county he or she serves. See Cetrulo, 157 A.2d at 301 ("The Legislature as well as the courts have long recognized the strong policy considerations which dictate that since the county prosecutor is charged with heavy enforcement responsibilities he must be given broad powers to appoint his own personnel."); Mercer County Bd. of Freeholders v. Mercer County Prosecutor, 412 A.2d 809, 810 (N.J. Super. Ct. App. Div. 1980) (New Jersey statute that permits the county prosecutor to go to the county's assignment judge for authorization of funding in excess of that approved by the county freeholders "indicates a legislative intent to place the prosecutor in a dominant position with relation to the freeholders for the

purpose of maintaining his integrity and effectiveness"); Ruvoldt v. Clark, 499 A.2d 247, 250 (N.J. Super. Ct. Law Div. 1983) (holding that the county has no control over a Prosecutor's nonsalary expenditures that do not exceed his budget because "it would be incongruous to permit county government to control the operations and functions of the Prosecutor, a constitutional officer entrusted with awesome duties of `vast importance to the public'").

Both the County of Monmouth and the New Jersey State Attorney General's Office, which filed an amicus brief, make convincing arguments that under the existing New Jersey constitutional and statutory scheme, neither the Attorney General nor the County of Monmouth can truly be said to "control" the personnel decisions of Prosecutor Kaye. Therefore, if Lehmannprovides the appropriate test, we would have to conclude that no governmental entity in the State of New Jersey can under any circumstances be held accountable for a county prosecutor's acts of intentional discrimination, no matter how flagrant and persistent the violations are, because county prosecutors are neither state nor county officials. We do not believe that the New Jersey Supreme Court would countenance such an untoward result.

The New Jersey Legislature and the New Jersey Supreme Court have expressed a persistent and strong commitment to eradicating discrimination in the workplace. See Lehmann, 626 A.2d at 454 ("The purpose of the LAD is to eradicate discrimination, whether intentional or unintentional."); Grigoletti v. Ortho Pharmaceutical Corp., 570 A.2d 903, 911 (N.J. 1990) ("[T]he LAD represents a strong commitment to counteract discrimination attributable to sex or gender, an evil that is felt acutely in terms of employment and economic treatment."); Fuchilla v. Layman, 537 A.2d 652, 660 (N.J.) (citing New Jersey's "clear public policy . . . to abolish discrimination in the work place"), cert. denied, 488 U.S. 826, 109 S. Ct. 75 (1988); Peper v. Princeton Univ. Bd. of Trustees, 389 A.2d 465, 478 (N.J. 1978) (noting the "repugnant" nature of sex discrimination and that "New Jersey has always been in the vanguard in the fight to eradicate the cancer of unlawful discrimination of all types from our society").

The New Jersey Supreme Court has further stated that the LAD, "as remedial social legislation, . . . is deserving of a liberal construction." Clowes v. Terminix Int'l, Inc., 538 A.2d 794, 802 (N.J. 1988). The supreme court views "the issue of the scope of an employer's liability for compensatory and punitive damages" under the LAD to be "a question of public policy," in which the most critical underlying consideration is "which position provides the most effective intervention and prevention of employment discrimination." Lehmann, 626 A.2d at 465.

The extension of Lehmann's agency principles to Coleman's sex discrimination suit against the County of Monmouth is logically unacceptable because county prosecutors are clearly government officials who, reason dictates, must be acting on behalf of a some governmental entity when they make personnel decisions. The agency paradigm fails here because it would require us to reach the specious conclusion that Prosecutor Kaye was not acting under the authority of any state governmental body, either state or county,

when he passed Coleman over for promotion.  We must therefore look to New Jersey constitutional, statutory and decisional law to determine which level of state government the county prosecutor "belongs" when making personnel decisions.

3.

Our review of New Jersey Supreme Court decisions that have discussed the relation of the county prosecutor to the State Attorney General is both instructive and supportive of our conclusion that county prosecutors are acting as county officials when they make employment decisions.  The issue of the county prosecutor's role in relation to the Attorney General was discussed in great detail in Morss v. Forbes, 132 A.2d 1 (N.J. 1957).  The question presented in Morss was whether the New Jersey Legislature had the authority to compel a county prosecutor to disclose certain information and records relating to wiretapping activities authorized by his office.  Morss, the Union County Prosecutor, resisted these demands, arguing that by compelling "the disclosure of information which the prosecutor has deemed to be confidential, the [Legislative] Committee is transgressing upon the doctrine of separation of powers and actually invading the exclusive province of a coordinate body."  Id. at 11.

The New Jersey Supreme Court rejected this argument, holding that the county prosecutor could be required to turn the wiretap information over to the state legislature.  In reaching this conclusion, the court analyzed the question of "the role . . . the [county] prosecutor plays in the governmental structure."  Id. at 14.  In so doing, the Morss court described the role of the State Attorney General and county prosecutors in relation to each other within the framework established by the New Jersey Constitution:

> By provision of the Constitution of 1947, both the attorney general and the county prosecutor are constitutional officers.  Both are appointed by the Governor with the advice and consent of the Senate.  The attorney general serves a term coexistent in length with that of the Governor, but the county prosecutor serves for five years, or until the appointment and qualification of a successor.  The attorney general, as head of the Department of Law and Public Safety, is within the executive department (Art. V, Sec. IV, par. 3), but the provision for the appointment of prosecutors is found in Art. VII, Sec. II, par.1, 'Public Officers and Employees.'

Id. at 16-17.  The supreme court concluded that "[t]hese constitutional provisions fail to furnish any guide or standard with respect to the nature of powers, rights, duties and responsibilities of either officer, and, consequently, the task of definition is left to the Legislature."  Id. at 17.

Reviewing the applicable statutes that govern the relationship between the county prosecutor and the state government, the Morss court noted that despite the Attorney

General's statutory power of supersession, "the presently existing situation under the Constitution of 1947 . . . strongly reaffirms that the [county] prosecutors are largely independent of control by the attorney general . . . ." Id. at 16. The court noted the demonstrable lack of a "chain of command between the attorney general and the county prosecutors." Id. at 17. Evaluating the powers and responsibilities of the Attorney General and the county prosecutors within their respective governmental spheres led the court to recognize "the essential independence of the two offices and the disparateness of their powers." Id.

The Morss court expressed serious reservations as to whether the New Jersey statutory scheme "imports a close supervisory relationship between the attorney general and the county prosecutors." Id. Nor did "it appear that the Governor is responsible for the daily functioning of the prosecutor's office." Id. at 18. The court also attached significance to the fact that county prosecutors "receive their remuneration from the county." Id.

Although the Morss court paid due regard to the governor's power to supersede the county prosecutor's authority, it ultimately concluded that "the existence of this power of supersession does not bring the prosecutors so directly under the influence of the Governor that they automatically qualify as full-fledged members of the state executive branch." Id. Summing up on its lengthy discussion on this issue, the supreme court concluded that

> although there is confusion and uncertainty
> with regard to [the county prosecutor's]
> status by reason of the fact that his office
> is created by the Constitution, he is
> appointed by the Governor with the advice and
> consent of the Senate, the Legislature
> prescribes his duties, while he is paid by the
> county, . . . there is nevertheless little
> doubt but that the executive chain of command
> is not sufficiently prominent to enable the
> prosecutor to claim any high prerogative which
> might be enjoyed by the state executive with
> respect to withholding information from the
> Legislature. . . . The prosecutor is primarily
> a local official.

Id. at 18-19 (emphasis added). The Morss court's pronouncement on the locus of the county prosecutor's authority supports our conclusion that county prosecutors act as county officials when they make personnel decisions. Morss implies that absent direct intervention by the State, county prosecutors act as county officials when they are called upon to make administrative decisions on a local level.

One of the authorities upon which the district court relied in concluding that Prosecutor Kaye had acted as a state official when he decided not to promote Coleman was Justice Pashman's partial concurrence and dissent in In re Ringwood Fact Finding Committee, 324 A.2d 1, 5-15 (N.J. 1974) (Pashman, J.,

concurring in part and dissenting in part).  In Ringwood, Justice
Pashman declared that "[t]his State has always recognized the
prosecutor's primacy as a representative of the executive branch."
Id. at 8.  Justice Pashman also attempted to limit the scope of
Morss by citing the alleged implications of the New Jersey
Legislature's enactment of the Criminal Justice Act of 1970.  As
explained by Justice Pashman, this state statute had "consolidated
many previous statutes dealing with the attorney general's and
prosecutor's authority in an attempt to encourage more cooperation
and coordination among law enforcement authorities in combating
organized crime."  Id. at 10.  Justice Pashman opined that this
development had "altered the relationship of county prosecutors to
the executive branch" and thereby "render[ed] inapplicable much of
the discussion [in Morss]."  Id. at 11.

Justice Pashman's opinion in Ringwood provides no
significant support for the proposition that county prosecutors in
New Jersey always act as state officials irrespective of the duties
that they are called upon to perform.  In addition to not speaking
for the majority of the court, Justice Pashman confined his
discussion to the classic law enforcement functions of the
prosecutor's office, as opposed to the day-to-day personnel
decisions that are at issue in the instant case.  The fact that the
prosecutor "[i]n his county . . . is the foremost representative of
the executive branch of government in the enforcement of the
criminal law" is not disputed here.  State v. Winne, 96 A.2d 63, 72
(N.J. 1953) (emphasis added).  What we must address is the county
prosecutor's role in the promotion process on the local level, an
issue separate and apart from the prosecutor's well-recognized
executive investigatory and prosecutorial functions.

The New Jersey Supreme Court revisited the relation of
the county prosecutor to the executive branch of state government
in Cashen v. Spann, 334 A.2d 8 (N.J.), cert. denied, 423 U.S. 829,
96 S. Ct. 48 (1975).  Cashen involved a search of a private
residence based upon a search warrant affidavit that admittedly was
"grossly erroneous in significant respects."  Id. at 10.  The
question presented was whether the Morris County Prosecutor and the
detectives who prepared the affidavit, who were defendants in this
action, were acting as agents of the State when their allegedly
tortious conduct had arisen out of the investigation of criminal
activity.  The Cashen court held that "in the context of this case,
the prosecutor and the detectives are to be considered as agents of
the State and not the county."  Id. at 14.

The Cashen court gave no indication of limiting or
otherwise distinguishing the court's previous decision in Morss,
which had recognized the county prosecutor's broad discretion in
performing local administrative functions and great degree of
independence from the State government in many respects.  As such,
the supreme court was careful to ensure that its holding would not
be read too broadly:

> We wish to make it clear . . . that our
> resolution of this issue is limited to the
> factual circumstances here presented.  We find
> it appropriate to regard the defendant
> officials as State agents where the alleged

> tortious conduct arose out of the investigation of criminal activity, but we express no opinion on the question of whether the prosecutor or his detectives can be considered State or county employees for other purposes. We also leave for another day the question of whether a county may be held vicariously liable for the conduct of a prosecutor or his detectives in other circumstances.

Id. (citation omitted). The issue that the Cashen court reserved on is before this court today.

In Dunne v. Fireman's Fund American Insurance Co., 353 A.2d 508 (N.J. 1976), the New Jersey Supreme Court held that county detectives whose duties consisted of performing services exclusively for the prosecutor were "employees of the county" within the meaning of an insurance policy affording coverage to county employees acting within the scope of their duties. Applying reasoning that could apply equally in the prosecutorial setting, the court noted that "in preparing and executing the affidavit upon which the search warrant was based and conducting the search, [the investigators] were `agents of the State.' At the same time they were also employees of and there existed an employer-employee relationship with the County." Id. at 512.

The Dunne court stated that "[c]ounty prosecutors' detectives possess a hybrid status." Id. at 511. Our review of New Jersey law has convinced us that the same can be said about county prosecutors. When county prosecutors engage in classic law enforcement and investigative functions, they act as officers of the State. But where, as here, the county prosecutor decides whether an employee at his or her office is worthy of an open promotion, the county prosecutor is performing an administrative function on the local level entirely unrelated to the duties involved in criminal prosecution. We therefore conclude that Prosecutor Kaye was acting as a local, county official when he denied Coleman's applications for promotion.

Prosecutor Kaye's constitutional and statutory authority went far beyond that of a typical supervisory employee. Kaye possessed final policymaking authority under state law to manage the internal affairs of his office. The New Jersey LAD is intended to redress intentional discrimination, Goodman v. London Metal Exch., Inc., 429 A.2d 341, 347 (N.J. 1981), and it is uncontroverted that the jury verdict against the County of Monmouth was supported by multiple findings of intentional discrimination. We hold, therefore, that the discriminatory acts of Kaye and his subordinates may be imputed to the County of Monmouth since Kaye was the final policymaking authority acting on behalf of Monmouth County in the prosecutor's office. We therefore conclude that the compensatory and punitive damages awards levied against the County of Monmouth should not have been vacated on either of the grounds upon which the district court relied.

IV.

Having rejected the two grounds upon which the district court vacated the jury verdict against the County of Monmouth, we now address the merits of the other claims asserted by the parties to this action. Although Coleman's complaint stated claims against the County of Monmouth and Prosecutor Kaye under 42 U.S.C. 1983, New Jersey LAD and Title VII, the verdict sheets issued to the jury provided no space for the jury to indicate which causes of action formed the basis of the defendants' liability. Furthermore, for reasons that are not clear from the record, the jury was not instructed on all of the claims that were asserted in Coleman's complaint. No objections, however, were raised by any of the parties as to the content of the instructions, despite the district court's apparent decision not to instruct the jury on the elements of a number of the claims set forth in Coleman's complaint. With these considerations in mind, we will now address the other issues that must be resolved in this case.

A.

The County of Monmouth relies upon the conclusions of the district court as to the service of process issue and the county prosecutor's status vis-a-vis the Attorney General in support of its argument that the issue of compensatory damages should not have been submitted to the jury. We have already rejected the merits of these claims and need not address them again. We therefore conclude that the compensatory damages award of $15,000 imposed on the County of Monmouth must be reinstated.

An overwhelming portion of the damages award that the jury assessed against the County of Monmouth ($350,000 out of a total of $365,000) was allocated to punitive damages. As 1983 plaintiffs may not obtain punitive damages against a county defendant, City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S. Ct. 2748 (1981), the jury must have found implicitly that the County, through Kaye, had violated the New Jersey LAD. The jury's findings that Prosecutor Kaye and/or his subordinates intentionally discriminated against Coleman on three occasions provides a sufficient foundation to support a jury award of punitive damages against the County of Monmouth. We therefore conclude that the jury award of punitive damages against Monmouth County must also be reinstated.

B.

The jury found that Prosecutor Kaye intentionally discriminated against Coleman by not promoting her to sergeant in both June of 1990 and October of 1990. Based upon these findings, the jury awarded Coleman $10,000 in compensatory damages for the "pain, suffering, humiliation and mental anguish" she endured as a result of Kaye's actions. App. at 396. The jury also awarded Coleman an additional $50,000 in punitive damages against Kaye. $15,000 of this award was premised on the first act of intentional discrimination in June of 1990. An additional $35,000 was assessed for the second incident in October of 1990.

As to the various civil rights claims that Coleman asserted in her complaint against Prosecutor Kaye, the district court instructed the jury, without objection, only upon what it would be required to find in order to hold Kaye liable for

compensatory and punitive damages under 42 U.S.C. 1983. Accordingly, we will analyze Prosecutor Kaye's arguments under controlling 1983 case law. We conclude that the jury's finding that Prosecutor Kaye intentionally discriminated against Coleman on two occasions is supported by the record and provides ample justification for its award of compensatory and punitive damages against Kaye under 1983.

Prosecutor Kaye challenges the jury award of compensatory and punitive damages on the following grounds. First, Kaye argues that his Rule 50(b) motion for judgment as a matter of law should have been granted by the district court because no "actual injury" occurred here and that 1983 does not permit plaintiffs to recover compensatory damages for the type of harm that Coleman is alleged to have suffered. Second, Kaye argues there is insufficient evidence on this record to support a jury finding that he discriminated against Coleman. Kaye also makes the related contention that the record is critically deficient of evidence to support an award of either compensatory or punitive damages against Kaye in his individual capacity. We will address these issues seriatim.

Prosecutor Kaye argues that Supreme Court's decision in Carey v. Piphus, 435 U.S. 247, 98 S. Ct. 1042 (1978), precludes an award of compensatory damages for the personal humiliation and mental anguish Coleman is alleged to have endured as a consequence of Kaye's acts of intentional discrimination. The Supreme Court's decision in Memphis Community School District v. Stachura, 477 U.S. 299, 106 S. Ct. 2537 (1986), however, holds otherwise. The Stachura Court expressly held that "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as `impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'" Id. at 306, 106 S. Ct. at 2543 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S. Ct. 2997, 3012 (1974)). We reject Kaye's argument that Coleman did not suffer an "actual injury" because a reasonable jury could credit Coleman's testimony as to the personal anguish she suffered as a result of being passed over for promotion.

Prosecutor Kaye's evidentiary insufficiency argument is similarly without merit. The gist of Kaye's argument is that he cannot be held personally liable for intentional discrimination because he merely rubber stamped the suggestions of his subordinates and had no awareness of the problems that Coleman was facing. We find ample evidence in the record to reject this argument. A reasonable jury could conclude that Kaye, despite his awareness of Coleman's qualifications and the serious allegations of sex discrimination that she had raised, nonetheless chose to exercise his final policymaking authority in employment matters in a legally impermissible manner.

After Coleman was denied a promotion in May of 1989, she suspected that she had been discriminated against and initially sought redress from her superiors in the Monmouth County Prosecutor's Office. After her May 1989 rejection, Coleman prepared a memorandum to Prosecutor Kaye, dated May 24, 1989, which alluded to her suspicions that she had not been promoted because of her sex. Coleman felt aggrieved because she perceived that "men

with less experience and seniority were considered and promoted."
App. at 513.  In her May 24, 1989 memorandum to Prosecutor Kaye,
Coleman wrote that

> [t]hroughout my entire career of over
> sixteen years in Law Enforcement, I have never
> believed that a person should be promoted
> based upon race, sex, creed or national
> origin.  However, the recent promotion of
> fourteen men, four with less time in the
> Prosecutor's Office and one who you passed
> over nineteen people to promote in my field of
> training and expertise, has prompted me to ask
> the following question:
>
> What exactly have I done, or not done, to
> warrant being passed over or not even
> considered for promotion?

Id. at 514.  Coleman hand delivered this memorandum to Chief of
Investigations Frank R. Licitra, who later informed Coleman that he
had personally submitted it to Kaye.  Prosecutor Kaye never replied
to Coleman's inquiry.

Coleman sent Kaye a follow-up memorandum, dated November
6, 1989, concerning her failure to be promoted in May of 1989.  In
the November 6, 1989 memorandum, Coleman asked Kaye to "[p]lease
advise [her] what steps [he] intend[ed] to take to remedy this
discrimination."  Id. at 513.  Once again, Kaye did not respond.
Moreover, there is no indication in the record that Coleman's
allegations of discrimination were ever investigated.

Prosecutor Kaye can be held liable under  1983 if he had
actual knowledge of discriminatory conduct and acquiesced in it.
As we explained in Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d
Cir. 1988), "[p]ersonal involvement can be shown through
allegations . . . of actual knowledge and acquiescence."  Since
Coleman had presented her concerns to Kaye in writing about the
discriminatory treatment that she was enduring, and Kaye chose to
take no action whatsoever, the pattern of discriminatory conduct
that Coleman alleges took place at the Monmouth County Prosecutor's
Office at this time takes on added significance.

Coleman presented evidence at trial that called into
question the manner in which she had been evaluated in comparison
to her male counterparts, who had also applied for promotions on
the occasions in question.  For example, Chief Licitra prepared
Coleman's performance evaluation for the period of November 1, 1988
through April 30, 1989.  Although Coleman was rated as
"outstanding" in five of six categories, and was also given a
"plus" or "strong" rating in twenty-nine of thirty-one
subcategories, she received an overall rating of only "competent."
App. at 521.  Specifically, in the category of "Investigative
Ability," Coleman received four pluses (signifying a strength) and
two checks (indicating standard performance).  This was the only
category of the six evaluated in which Coleman received a
"competent" rating.

By way of contrast, Michael Campbell, an investigator who

was ultimately selected for promotion over Coleman, rated "outstanding" in only one of the six categories evaluated, that of "Investigative Ability." Although Campbell was also given an overall rating of "competent," he received an evaluation of "outstanding" in investigative ability, despite the fact that he had been rated as "strong" in only two of the six subcategories that are considered under this heading. Id. at 522. Furthermore, in stark contrast to Coleman, Campbell received a "plus" or "strong" rating in only three of the thirty-one subcategories upon which candidates for promotion were evaluated.

Coleman also introduced evidence at trial that procedures utilized by the Monmouth County Prosecutor's Office to evaluate candidates for promotion were altered in a manner that seriously hindered her efforts to obtain a promotion. Coleman alleges that General Order 90-3, promulgated on April 19, 1990, was intended to provide a pretextual justification for the denial of future promotions. Order 90-3 established as a promotion criterion the length of time served in a specific unit, as opposed to seniority as an investigator, which had been a promotion criterion under the previous system. This new evaluation process had the effect of giving less-experienced male investigators a seniority advantage over Coleman when promotion decisions were to be made.

The jury found Coleman's testimony to be credible and her arguments to be convincing. Since Coleman presented her concerns to Prosecutor Kaye via memoranda on two occasions and received no response, a reasonable jury could properly reject Kaye's arguments that he had no actual knowledge and was not involved in the discrimination that occurred. Viewing this "evidence in the light most favorable to [Coleman] and giving [her] the advantage of every fair and reasonable inference," Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993), we conclude that there is sufficient evidence in this record to support the jury's finding of liability against Prosecutor Kaye in his individual capacity.

Prosecutor Kaye also alleges that there was no legally sufficient basis from which a jury could award punitive damages. The jury found that Kaye had intentionally discriminated against Coleman on two occasions. On the verdict sheet, the jury assessed $15,000 in punitive damages for the first violation in June of 1990 and $35,000 for the second violation in October of 1990. We conclude that the jury's finding of two acts of intentional discrimination, after having been put on notice of a prior act of discrimination against the same plaintiff, evinces the requisite "reckless or callous indifference" to Coleman's federally protected rights. Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640 (1983). We will therefore uphold the jury's imposition of a $50,000 punitive damages award against Prosecutor Kaye in his individual capacity.

V.

Having prevailed on her  1983 claim against Prosecutor Kaye, Coleman is entitled to an award of reasonable attorneys' fees under 42 U.S.C.  1988. On September 8, 1995, the district court issued a memorandum opinion discussing the attorneys' fees issue. Coleman v. Kaye, No. 91-1140 (D.N.J. Sept. 8, 1995). Since by that

time the district court had dismissed the County of Monmouth as a party to this action, Prosecutor Kaye was required to pay the entire fee award. After reviewing Coleman's attorneys' fee application, the district court reduced substantially the hourly rates that Coleman's attorneys had sought, noting that "[t]hroughout the entire adjudication of this matter, this Court has had a significant opportunity to assess the skills and experience of the attorneys involved. As a result, this Court will reduce plaintiff's counsels' hourly rates to `rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" Id. at 5 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). The district court ordered that Prosecutor Kaye would be liable to pay Coleman $101,184 in attorneys' fees, in addition to $3,968.92 in costs. Coleman argues that the district court abused its discretion when it reduced the hourly rates sought by her attorneys, based upon its conclusory observations as to "the skills and experience of the attorneys involved." Coleman, No. 91-1140, slip op. at 5. We agree.

## A.

As we explained in Silberman v. Bogle, 683 F.2d 62, 65 (3d Cir. 1982), our standard of review in this context "is a narrow one. We can find an abuse of discretion if no reasonable man would adopt the district court's view." The district court's discretion, however, is not without bounds. We have held that a district court may not set attorneys' fees based upon a generalized sense of what is customary or proper, but rather must rely upon the record. Cunningham v. City of McKeesport, 807 F.2d 49, 52-53 (3d Cir. 1986), cert. denied, 481 U.S. 1049, 107 S. Ct. 2179 (1987). It is this requirement that the district court failed to satisfy.

As the Supreme Court explained in Blum v. Stenson, 465 U.S. 886, 895, 104 S. Ct. 1541, 1547 (1984), "[t]he statute and legislative history establish that `reasonable fees' under 1988 are to be calculated according to the prevailing market rates in the relevant community . . . ." See Student Pub. Interest Research Group of New Jersey, Inc. v. AT & T Bell Labs., 842 F.2d 1436, 1442 (3d Cir. 1988) ("Market rates have served as the prime focus of our inquiry in ascertaining reasonable attorneys' fees."). Although Coleman's attorneys submitted affidavits in support of their assessment of the prevailing market rate, the district court did not address this evidence. The record is not clear whether any affidavits were filed in opposition to the hourly rates claimed by Coleman's attorneys. In fact, the district court failed to cite any record evidence in support of its conclusion that the fees requested by Coleman's attorneys were unreasonable.

The number of hours that Coleman's attorneys reasonably expended in litigating this matter is not in dispute. On this record, however, "the findings of the district court purporting to justify a reduction in the fee request are not specific and lack the evidentiary basis to counter the . . . affidavit of plaintiff's counsel detailing the[ir] . . . billing rate[s]." Cunningham, 807 F.2d at 52. We therefore hold that if the hourly rates are

contested, the district court on remand must conduct a hearing in order to calculate reasonable hourly rates "according to the prevailing market rates in the relevant community." Rode, 892 F.2d at 1183. We express no opinion as to whether the hourly rates sought by Coleman's attorneys are reasonable, in the absence of a more fully developed record.

B.

Prosecutor Kaye argues that he alone should not have been required to pay the entire amount of the prevailing party's attorneys' fees and costs incurred in this matter. We agree. As we have held that the jury verdict against the County of Monmouth is to be reinstated, Prosecutor Kaye should not have been ordered to pay the entire amount of the lodestar figure plus costs. It is a well-established principle that when multiple defendants are held to be liable in a civil rights action, the proper course of action for a district court is to allocate responsibility for the payment of fees among the responsible parties. See, e.g., Vargas v. Hudson County Bd. of Elections, 949 F.2d 665, 677 (3d Cir. 1992). Under this analysis, "each defendant must bear the prevailing plaintiff's fees for time spent on matters clearly related to the claims made against that defendant." Williamsburg Fair Hous. Committee v. Ross-Rodney Hous. Corp., 599 F. Supp. 509, 514 (S.D.N.Y. 1984). On remand, the district court must apportion the hours that it has found to have been reasonably spent by Coleman's attorneys on this case between the claims asserted against Prosecutor Kaye and those against the County of Monmouth.

A further complication must also be resolved. Our discussion of the counsel fees claim asserted against Prosecutor Kaye focused exclusively upon his responsibility to pay reasonable attorneys' fees under 42 U.S.C. 1988. This analysis was appropriate because, as to defendant Kaye, Coleman's 1983 claim was the only theory of liability upon which the jury was instructed. The County of Monmouth, however, was found to have violated the New Jersey LAD. Coleman argues that the district court erred in not awarding a contingency fee enhancement under the attorneys' fees provision of the LAD. To evaluate this claim, we must review how the counsel fees provision of LAD has been interpreted by the New Jersey Supreme Court.

The New Jersey approach to the issue of contingency enhancement under the LAD is a marked departure from the Supreme Court's interpretation and application of federal fee-shifting statutes. The New Jersey Supreme Court's decision Rendine v. Pantzer, 661 A.2d 1202 (N.J. 1995), addressed in a thorough and comprehensive manner the issue of the propriety of contingency enhancements under the fee-shifting provisions of the LAD. SeeN.J. Stat. Ann. 10:5-27.1. The Rendine court elected to depart from Supreme Court precedent on this issue and thereby established a rule that strongly favors the award of contingency enhancements to prevailing parties under the LAD.

In City of Burlington v. Dague, 505 U.S. 557, 112 S. Ct. 2638 (1992), the Supreme Court was called upon to interpret the attorneys' fees provisions of the Solid Waste Disposal Act, 42 U.S.C. 6972(e), and the Federal Water Pollution Control Act, 33

U.S.C. 1365(d). Both these statutes contain language that is comparable to that of 42 U.S.C. 1988. See 505 U.S. at 562, 112 S. Ct. at 2641. The Court rejected the prevailing parties' argument that they were entitled to a contingency enhancement, holding that such relief "is not permitted under the fee-shifting statutes at issue." Id. at 567, 112 S. Ct. at 2643-44.

The New Jersey Supreme Court in Rendine expressly rejected the reasoning and analysis of the Dague majority, holding that "a counsel fee awarded under a fee-shifting statute cannot be `reasonable' unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed." 661 A.2d at 1228. The Rendine court opined "that contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar." Id. at 1231. Thus, the district court on remand must also determine the appropriate degree of contingency enhancement that the County of Monmouth will be required to pay under the principles set forth in Rendine.

VI.

Coleman's final claim is that she, as a prevailing tort plaintiff under New Jersey law, is entitled to an award of prejudgment interest under the New Jersey Court Rules. Specifically, N.J. Ct. R. 4:42--11(b) provides in relevant part that:

> Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, . . . include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. . . .

Id. (emphasis added). Awards of prejudgment interest, when appropriate, apply only to awards of compensatory damages. See Belinski v. Goodman, 354 A.2d 92, 96 (N.J. Super. Ct. App. Div. 1976).

We reject Coleman's claim of entitlement to prejudgment interest against either Prosecutor Kaye or the County of Monmouth. As to Prosecutor Kaye, the jury's instructions were limited to Coleman's federal civil rights claim under 42 U.S.C. 1983. As such, Kaye could only have been held to be liable under federal law. Therefore, prejudgment interest cannot be awarded against Prosecutor Kaye under New Jersey Law.

Nor can prejudgment interest be assessed against the County of Monmouth. The court rule that Coleman invokes expressly provides that prejudgment interest will not be awarded against a

public entity "[e]xcept where provided by statute . . . ."  N.J. Ct. R. 4:42--11(b).  There is no statutory authorization in New Jersey for such an award.  To the contrary, as the New Jersey Appellate Division stated in Maynard v. Mine Hill Township, 582 A.2d 315, 318 (N.J. Super. Ct. App. Div. 1990), the New Jersey Tort Claims Act "specifically prohibits prejudgment interest against government tortfeasors."  See N.J. Stat. Ann.  59:9-2(a) ("No interest shall accrue prior to the entry of judgment against a public entity or public employee.").

## VII.

We will affirm the order of the district court to the extent that it denied Prosecutor Kaye's motion for a judgment as a matter of law.  We will reverse the order of the district court vacating the jury verdict against the County of Monmouth and order the judgment entered against the County be reinstated.  If on remand the defendants elect to challenge the hourly rates put forth by Coleman's attorneys, a hearing must be held to determine a reasonable hourly rate for their services.  Once the lodestar is calculated, responsibility for paying the attorneys' fees award is to be allocated among the defendants on a percentage basis.  After the responsibility for the payment of attorneys' fees has been properly apportioned, the district court must also consider the appropriate degree of contingency enhancement to apply to the County of Monmouth's portion of the fee award under New Jersey law.

Costs taxed to the County Prosecutor's Office of the County of Monmouth and John Kaye.